March 31, 1999

2--97--1099

_________________________________________________________________ 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THERESE NEADE, as Independent ) Appeal from the Circuit Court

Adm'r of the Estate of ) of Lake County.

Anthony Robert Neade, Deceased, )

                )                 

     Plaintiff-Appellant,             )

) Nos. 92--L--1074

v. )     94--L--1103  

)

STEVEN PORTES, and ) 

PRIMARY CARE FAMILY CENTER,      )

S.C., )

                )                

Defendants-Appellees ) Honorable

) Bernard E. Drew,

(Thomas Engel, Defendant). ) Judge, Presiding.

______________________________________________________________________________

JUSTICE THOMAS delivered the opinion of the court:

Plaintiff, Therese Neade, as the administrator of the estate of her deceased husband, Anthony Neade, appeals the circuit court's judgment dismissing portions of count I and all of count II of her amended complaint against defendants Steven Portes, M.D., and Primary Care Family Center, S.C. (Primary Care).  At the times alleged in plaintiff's complaint, Dr. Portes was president of Primary Care.  Count I alleged that defendants committed medical negligence, which caused the death of Anthony Neade.  Count II alleged that Dr. Portes breached his fiduciary duty to Anthony Neade by failing to disclose that he had a contract with Neade's Health Maintenance Organization (HMO) that created an incentive to minimize diagnostic tests and specialist referrals.  On appeal, plaintiff contends that the trial court erred in striking the allegations from count I of her amended complaint because those allegations adequately alleged a breach of the applicable standard of care.  Plaintiff also contends that the trial court erred in dismissing count II of the amended complaint because that count stated a cause of action for breach of fiduciary duty.

I.  FACTS

Plaintiff's amended complaint alleged the following.  Anthony Neade was approximately 37 years old in 1990 when he began to show the classic symptoms of coronary artery blockage, including chest pain radiating into his arm and shortness of breath.  As a result, Neade was hospitalized from August 10 to 13, 1990.  In addition to his physical symptoms, Neade had a family history of heart disease, was overweight, suffered from hypertension, smoked, and had a high cholesterol count.  While in the hospital, Neade underwent various tests, including a thallium stress test.  Dr. Thomas Engel (a defendant below but not a party to this appeal) interpreted the result as normal and discharged Neade with a diagnosis of hiatal hernia and/or esophagitis.  Count III of plaintiff's amended complaint, which is not at issue in this appeal, alleged that Dr. Engel misinterpreted the thallium stress test and EKG data results.  However, even if the test results were properly interpreted, plaintiff alleged that Dr. Portes knew that 20% of normal or negative thallium stress test results are false negatives.  

Following his discharge from the hospital, Neade continued to experience chest pain and, therefore, saw Dr. Portes on August 17, August 28, and September 24, 1990.  Dr. Portes did not examine Neade during these visits but, relying on the thallium stress test and EKG data, assured Neade that his chest pain was not cardiac related.

In October 1990, Neade again went to Primary Care complaining of stabbing chest pain.  Dr. Portes asked his associate, Dr. George Huang, to examine Neade.  Primary Care employed Dr. Huang part time, and he had no hospital privileges.  After examining Neade, Dr. Huang recommended that he undergo an angiogram, a test that is more specific for coronary artery disease than the thallium stress test.  Because Dr. Portes was Neade's primary care physician, however, Dr. Portes had to authorize any hospitalization or additional tests.  Without examining Neade, Dr. Portes told Dr. Huang that the pain was not cardiac related and refused to authorize Neade's hospitalization for an angiogram.

In June 1991, Neade again returned to Primary Care, complaining of chest pain radiating up the right side of his neck and sweating when the pain was great.  At Dr. Portes's request, Dr. Seymour Schlager, another part-time employee of Primary Care, saw Neade.  Dr. Schlager also recommended hospitalization for an angiogram, but Dr. Portes again refused to authorize hospitalization.  Without examining Neade and relying on the thallium stress test, Dr. Portes advised Dr. Schlager that Neade's chest pain was not cardiac related.

Count I of plaintiff's amended complaint alleged that Dr. Portes's reliance on the thallium stress test and the EKG and his failure to authorize an angiogram constituted medical negligence.  Further, as a proximate result of defendants' medical negligence, Neade suffered a massive myocardial infarction caused by coronary artery blockage on September 16, 1991.  Neade died nine days later.

The allegations that were stricken from count I of plaintiff's amended complaint alleged that Dr. Portes, as president of Primary Care, negotiated and entered into contracts with various entities, including Chicago HMO.  That contract provided a capitation fee for subscribers of Chicago HMO who utilized defendants' services, as well as a "Medical Incentive Fund," which was to be used for various purposes, including certain tests and referrals to medical specialists.  The contract further provided that any monies left in the Medical Incentive Fund at the end of the 12-month contract period would be split 60-40 between defendants and Chicago HMO.  Neade's health care insurance was through Chicago HMO.  Therefore, if Neade received an angiogram and a referral to a specialist, those fees would be paid from the Medical Incentive Fund administered by defendants.

Count II of plaintiff's amended complaint alleged that a fiduciary relationship existed between Dr. Portes and Neade pursuant to which Dr. Portes had a duty to act in good faith and in the best interest of Neade.  Plaintiff alleged that Dr. Portes breached his fiduciary duty by refusing to authorize further testing of Neade, refusing to allow specialists to examine Neade, failing to disclose to Neade defendants' financial relationship with Chicago HMO, including the Medical Incentive Fund, and entering into a contract with Chicago HMO which put defendants' financial well-being in direct conflict with Neade's physical well-being.  Plaintiff claimed that as a proximate result of defendants' breach of fiduciary duty, Neade suffered a massive myocardial infarction and died.  

Dr. Portes and Primary Care moved to strike from count I the allegations regarding the Medical Incentive Fund and to dismiss Count II entirely.  Defendants argued that any financial motive was irrelevant to whether Dr. Portes violated the applicable standard of care in treating Neade.  Defendants also argued that there was no cause of action against a physician for breach of fiduciary duty.  The trial court granted defendants' motion 
as to both counts with prejudice.

Plaintiff then filed a motion to reconsider, attaching to the motion plaintiff's affidavit and excerpts of the deposition of Dr. Jay Schapira.  Dr. Schapira testified that the applicable standard of care, as well as ethical considerations, required a doctor to divulge his financial interest in withholding care so that a patient could make an informed decision concerning the quality of care he is receiving and concerning the doctor's true motivation in treating him.  Plaintiff's affidavit stated that had she known of Dr. Portes's financial interest in refusing to authorize additional treatment for decedent, she would have sought a second opinion.  Plaintiff also filed a proposed "supplement" to the complaint incorporating these additional allegations.  Defendants filed a motion, which the trial court denied, to strike the deposition excerpt and affidavit from plaintiff's motion to reconsider.  However, after considering those materials, the court denied the motion to reconsider.  Plaintiff timely appealed.

II.  JURISDICTION

Initially, defendants contend that we lack jurisdiction to consider the court's order with regard to count I.  Defendants note that the trial court's original dismissal order striking sections of count I and dismissing all of count II of plaintiff's complaint was with prejudice but contained Illinois Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) language only with respect to count II.  In its subsequent order denying plaintiff's motion for reconsideration, however, the trial court stated that its prior order striking portions of count I and dismissing count II remained a final and appealable order pursuant to Rule 304(a) (155 Ill. 2d R. 304(a)).  Defendants claim that because the orders are ambiguous and because the bases for recovery of the stricken portions of count I are the same as the remaining portions of count I, the trial court's order with respect to count I cannot be a final and appealable order as a matter of law.

Rule 304(a) provides that if multiple claims for relief are involved in an action, a party may appeal a final judgment as to one or more but fewer than all of the claims only if the trial court has made an express written finding that there is no just reason to delay enforcement or appeal of its order. 155 Ill. 2d R. 304(a).  Thus, where separate counts in the same complaint contain different bases of recovery, and where the trial court makes the requisite finding, the dismissal of a count in the complaint is appealable because it disposes of a distinct cause of action.  
Viirre v. Zayre Stores, Inc.
, 212 Ill. App. 3d 505, 511 (1991).  

We note that Rule 304(a) speaks in terms of "claims," and not "counts."  Therefore, even though the trial court struck only portions of count I of plaintiff's amended complaint, those stricken portions, along with Count II, clearly resolved a distinct portion of the controversy between the parties: whether defendants are liable for failing to disclose the existence of the Medical Incentive Fund.  Accordingly, because the trial court's order disposed of a distinct claim against defendants, and the trial court made an express written finding in its second order that its order was final and appealable, we conclude that we have jurisdiction of plaintiff's entire appeal.

III.  STANDARD OF REVIEW

Defendants' motion to dismiss plaintiff's amended complaint was brought pursuant to section 2--615 of the Code of Civil Procedure.  735 ILCS 5/2--615 (West 1996).  Under that section, a trial court should dismiss a complaint only when it clearly appears that no set of facts that would entitle plaintiff to relief could be proved under the pleadings.  
Ogle v. Fuiten
, 102 Ill. 2d 356, 360-61 (1984).  A section 2--615 motion admits all well-pleaded facts but not conclusions of law or factual conclusions unsupported by allegations of specific facts.  
Talbert v. Home Savings of America, F.A.
, 265 Ill. App. 3d 376, 379 (1994).  We review the granting of a section 2--615 motion 
de novo
.  
Schiffner v. Motorola, Inc.
, 297 Ill. App. 3d 1099, 1103 (1998).

IV.  BREACH OF FIDUCIARY DUTY

As a preliminary matter, we note that defendants again object that plaintiff submitted her affidavit and excerpts from Dr. Schapira's deposition in her motion to reconsider.  As noted earlier, defendants had filed a motion to strike these materials, which the trial court denied.  The purpose of a motion for reconsideration is to apprise the court of newly discovered evidence, of any changes in the law, or of any errors in the trial court's earlier application of existing law.  
Farley Metals, Inc. v. Barber Colman Co.
, 269 Ill. App. 3d 104, 116 (1994).  Defendants contend that the materials submitted by plaintiff were not newly discovered evidence, did not indicate any change in the law, and were not necessary to plaintiff's argument that the trial court had erred in applying existing law.  

In her motion for reconsideration, plaintiff stated that the trial court had relied upon this court's decision in 
Taber v. Riordan
, 83 Ill. App. 3d 900 (1980), in dismissing count II of her complaint, that none of the parties had cited the 
Taber
 decision, and that the trial court had not provided a copy of the 
Taber
 decision to the parties during the hearing on defendants' motion to dismiss.  Plaintiff then argued that her case was distinguishable from 
Taber
 because expert testimony, which was missing in 
Taber
, was present in her case, as evidenced by Dr. Schapira's deposition and her affidavit.  Under the circumstances and in light of the unique facts of this case, we believe that the materials attached to plaintiff's motion for reconsideration were properly submitted in support of plaintiff's argument that the trial court had erred in applying existing law.  The trial court, therefore, properly denied defendants' motion to strike the affidavit and deposition excerpt. 

Defendants then claim that there is no case law to support plaintiff's argument that Dr. Portes had a fiduciary duty to disclose his contractual compensation relationship with Chicago HMO.  Defendants are correct that there is no Illinois case law addressing this issue.  In fact, in our review of other jurisdictions, we have found no cases that address the specific issue raised in this case.  However, given the changing nature of health care in this country, courts most likely will be faced with increasing issues concerning managed care and its effect on the physician-patient relationship.  Cost containment measures in the health care industry have come under increasing scrutiny in recent years.  Traditionally, the entity responsible for paying for health care was separate from the person or organization that delivered the health care.  Note, 
Financial Incentives to Limit Services: Should Physicians Be Required to Disclose These to Patients?
, 83 Geo. L.J. 1821 (1995).  More and more, however, the financing and the delivery of health care have been integrated, requiring physicians to be both a care giver and a cost manager.  83 Geo. L.J. at 1821.  Under managed health care plans similar to the plan through which Neade was insured, a patient must choose a primary care physician who serves as a "gatekeeper," deciding whether the patient requires laboratory tests, inpatient hospitalization, or a referral to a specialist.  83 Geo. L.J. at 1827.  Further, in risk/bonus arrangements like the Medical Incentive Fund here, the gatekeeper is paid a bonus for controlling referrals, which arguably creates an incentive for the gatekeeper to limit the use of high-end health services.  83 Geo. L.J. at 1828.

As one commentator has noted, most HMO enrollees do not know that their physicians have financial deterrents to providing more expensive health care to their patients.  83 Geo. L.J. at 1837.  Thus, in order to make proper choices concerning health care, "the mechanisms that govern the restrictions on treatment need to be disclosed to the patient."  83 Geo. L.J. at 1837.  In this case, plaintiff contends that the obligation to disclose financial incentive arrangement should be placed on the gatekeeper physician pursuant to his fiduciary duty and that a failure to do so constitutes a breach of fiduciary duty.  

As noted, in reviewing case law from other jurisdictions, we have found no cases that have addressed whether a physician has a fiduciary duty to disclose the financial incentive arrangement he has with an HMO, although we have found federal case law holding, under analogous fact patterns, that a patient has a cause of action against his HMO for failing to disclose the financial incentive scheme that it has with its physicians.  
Herdrich v. Pegram
, 154 F.3d 362 (7th Cir. 1998); 
Shea v. Esensten
, 107 F.3d 625 (8th Cir. 1997).

For example, in 
Shea
, following hospitalization for severe chest pain while on an overseas business trip, the decedent made several visits to his family doctor complaining of symptoms of heart disease.  
Shea
, 107 F.3d at 626.  The decedent complained of chest pains, shortness of breath, muscle tingling, and dizziness and discussed his extensive family history of heart disease.  
Shea
, 107 F.3d at 626.  The decedent's physician said that a visit to a cardiologist was unnecessary.  
Shea
, 107 F.3d at 626.  When his symptoms did not improve, the decedent said he would pay for the cardiologist himself, but his physician persuaded him that he was too young to have heart disease and that he did not have enough symptoms to justify an appointment with a cardiologist.  
Shea
, 107 F.3d at 626.  A few months later, decedent died of heart failure.  
Shea
, 107 F.3d at 626.  The decedent's health insurance was through an HMO which, unknown to the decedent, had a financial incentive agreement with its doctors that was designed to minimize referrals by rewarding the physicians for not making referrals to specialists and by docking the physicians a portion of their fees if they made too many referrals.  
Shea
, 107 F.3d at 627.  Decedent's widow claimed that if her husband had known about the financial incentive, he would have disregarded his physician's advice and would have consulted a cardiologist at his own expense.  
Shea
, 107 F.3d at 627.  

The district court dismissed plaintiff's claim alleging breach of the HMO's fiduciary duties under the Employee Retirement Income Security Act (ERISA) (29 U.S.C.A. §1001 
et seq.
 (West 1985)), finding that ERISA did not require an HMO to disclose its physician compensation arrangements.  
Shea
, 107 F.3d at 627.  The Eighth Circuit Court of Appeals reversed the dismissal, holding that the decedent's widow had stated a claim against the HMO for breach of its fiduciary duty to disclose all material facts affecting her husband's health care.  
Shea
, 107 F.3d at 629.  The court noted that " '[t]he duty to disclose material information is the core of a fiduciary's responsibility.' "  
Shea
, 107 F.3d at 628, quoting 
Eddy v. Colonial Life Insurance Co.
, 919 F.2d 747, 750 (D.C. Cir. 1990).  In addition, the court held:

"When an HMO's financial incentives discourage a treating doctor from providing essential health care referrals for conditions covered under the plan benefit structure, the incentives must be disclosed and the failure to do so is a breach of ERISA's fiduciary duties."  
Shea
, 107 F.3d at 629.

The court noted that a patient relies on his doctor's advice about treatment options and, thus, "must know whether the advice is influenced by selfserving financial considerations created by the health insurance provider."  
Shea
, 107 F.3d at 628.  

Likewise, in 
Herdrich
, the plaintiff alleged that her doctor discovered an inflamed mass in her abdomen but forced her to wait eight days before undergoing an ultrasound at a plan hospital 50 miles away.  As a result of the delay, plaintiff's appendix ruptured, creating a life-threatening condition which required additional treatment.  
Herdrich
, 154 F.3d at 374.  In an effort to defray costs, the plaintiff was required to again drive 50 miles to the plan hospital to drain and cleanse the ruptured appendix.  
Herdrich
, 154 F.3d at 374.  

The plaintiff filed a complaint against her health care plan for, 
inter
 
alia
, breach of fiduciary duty, alleging that the defendants breached their fiduciary duty to the plan beneficiaries by depriving them of proper medical care through a financial incentive arrangement with plan physicians that minimized the use of diagnostic tests, of facilities not owned by defendants, and of emergency and nonemergency consultations and referrals to nonplan physicians.  
Herdrich
, 154 F.3d at 366.  In reversing the district court's dismissal of plaintiff's claim for breach of fiduciary duty, the Seventh Circuit Court of Appeals held that "the language of plaintiff's complaint is sufficient in alleging that the defendants' incentive system depleted plan resources so as to benefit physicians who, coincidentally, administered the Plan, possibly to the detriment of their patients."  
Herdrich
, 154 F.3d at 380.

The foregoing cases, thus, recognize that patients should be informed of financial arrangements that may negatively impact their health care.  In this case, as noted, we must determine whether the burden of disclosing such relationships can be placed on a physician pursuant to his fiduciary duty.  While many jurisdictions, including our own, recognize that there is a fiduciary relationship between a physician and his patient, there is no consensus concerning whether a plaintiff can bring a cause of action against his physician for breach of fiduciary duty.  For example, the Supreme Court of California has held that a physician has a fiduciary relationship with his patient and that a patient can state a cause of action for breach of a physician's fiduciary duty to disclose facts material to the patient's consent.  
Moore v. Regents of the University of California
, 51 Cal. 3d 120, 793 P.2d 479, 271 Cal. Rptr. 146 (1990).  In 
Moore
, the plaintiff, who suffered from hairy-cell leukemia, alleged that the defendants, by virtue of the physician-patient relationship, conducted research on his cells and planned to benefit financially by their exclusive access to plaintiff's cells without disclosing the extent of their research and economic interests.  51 Cal. 3d at 128, 793 P.2d at 483, 271 Cal. Rptr. at 150.  The court concluded that a physician must disclose personal interests, whether research or economic, unrelated to the patient's health that may affect the physician's professional judgment.  
Moore
, 51 Cal. 3d at 129, 793 P.2d at 483, 271 Cal. Rptr. at 150.  Further, a physician's failure to disclose such interests may give rise to a cause of action for breach of fiduciary duty or for performing medical procedures without informed consent.  
Moore
, 51 Cal. 3d at 129, 793 P.2d at 483, 271 Cal. Rptr. at 150.  

In reaching its conclusion, the 
Moore
 court noted that "a reasonable patient would want to know whether a physician has an economic interest that might affect the physician's professional judgment."  51 Cal. 3d at 129, 793 P.2d at 483, 271 Cal. Rptr. at 150.  The court also noted that the desire to protect patients from a possible conflict of interest is reflected in legislative enactments prohibiting a physician from charging or referring a patient to an organization in which the physician has an interest without first disclosing that interest.  
Moore
, 51 Cal. 3d at 129-30, 793 P.2d at 483-84, 271 Cal. Rptr. at 150-51.  
Cf.
  
Bowlin v. Duke University
, 108 N.C. App. 145, 423 S.E.2d 320 (1992) (in claim for constructive fraud against physician arising out of breach of fiduciary duty, court recognized that plaintiff had established existence of relationship of trust and confidence with her physician but held that plaintiff had not stated claim absent allegations showing breach of fiduciary duty). 

In contrast, the court of appeals of Minnesota has held that a trial court properly dismissed the plaintiffs' claim for breach of fiduciary duty arising from their physician's failure to disclose a "kickback" scheme, whereby the distributor of Protropin, a synthetic growth hormone drug, made payments to the physician to induce him to refer patients for Protropin-related services and supplies.  
D.A.B. v. Brown
, 570 N.W.2d 168, 169 (Minn. App. 1997).  The court held that the complaint sounded in malpractice and that the allegations concerning the kickback scheme presented a classic informed consent issue.  
D.A.B.
, 570 N.W.2d at 171.  The court concluded:

"While we agree that a physician's advice about treatment options should be free from self-serving financial considerations, any cause of action based on that conduct necessarily flows from the therapeutic relationship.  Any breach of fiduciary duty that may have occurred during the doctor's prescription of medication to his patients arose while the doctor was examining, diagnosing, treating, or caring for his patients.  Thus, the complained-of acts constitute an integral part of the process of rendering medical treatment."  
D.A.B.
, 570 N.W.2d at 172.

In so holding, the court acknowledged that it had recognized causes of action against attorneys for breach of fiduciary duty in addition to legal malpractice claims but declined to recognize a separate cause of action against physicians.  
D.A.B.
, 570 N.W.2d at 172.

Similarly, the Colorado Court of Appeals has held that a trial court properly denied the plaintiffs' request to add a claim for breach of fiduciary duty to their complaint against their physician where the breach-of-fiduciary-duty claim would have been duplicative of their negligence claims.  
Spoor v. Serota
, 852 P.2d 1292 (Colo. App. 1992); see also 
Awai v. Kotin
, 872 P.2d 1332 (Colo. App. 1993) (claim for breach of fiduciary duty against psychologist properly dismissed where factual allegations supporting claim were same factual allegations that supported claim of negligence and, thus, were duplicative).  Using similar reasoning, the New Mexico Court of Appeals held that a breach-of-fiduciary-duty claim, based upon allegations that a chiropractor and his corporation designed treatment programs to the detriment of patients in order to generate income, did not state a cause of action separate from the plaintiff's fraud claim, and, therefore, the plaintiff could not recover under both causes of action.  
Garcia v. Coffman
, 124 N.M. 12, 946 P.2d 216 (N.M. App. 1997).  Finally, the Supreme Court of Arizona has declined to find a breach of trust action arising from an undisclosed risk of surgery where the plaintiff had an adequate remedy through a medical malpractice action should any undisclosed risk occur.  
Hales v. Pittman
, 118 Ariz. 305, 576 P.2d 493 (1978).

In those cases holding that a plaintiff could not state a claim for breach of fiduciary duty apart from a claim for medical negligence, the courts found that the breach-of-fiduciary-duty claims merely were duplicative of the medical negligence claims and, thus, would constitute a second recovery under one set of facts
.  In this case, defendants also claim that plaintiff's breach-of-fiduciary-

duty count is in essence a medical negligence claim and thus is duplicative and should be stricken.  While we are mindful that in many cases a cause of action for breach of fiduciary duty against a physician will be duplicative of a medical negligence claim, we also recognize, as did the court in 
Moore
, that in some instances a plaintiff may be able to plead a cause of action for breach of fiduciary duty separate from medical negligence.  We find support for our conclusion in legislative enactments, in the current opinions of the American Medical Association (AMA), and in cases holding that a plaintiff can plead separate causes of action against his attorney for legal negligence and for breach of fiduciary duty. 

Illinois courts have recognized that a fiduciary relationship exists between a physician and his patient.  
Petrillo v. Syntex Laboratories, Inc.
, 148 Ill. App. 3d 581, 587-88 (1986).  In addition, our legislature, like the California legislature, has recognized a potential conflict of interest where a physician or health care worker refers a patient for health services to an entity in which he has an investment interest.  225 ILCS 47/5 (West 1996).  Thus, the Health Care Worker Self-Referral Act (225 ILCS 47/1 
et seq
. (West 1996)) prohibits a health care worker from referring a patient for health services to an entity in which he is an investor and in which he does not provide direct services, unless the health care worker discloses his investment interest to the patient.  225 ILCS 47/20(b)(7) (West 1996).  Further, if the health care worker's financial interest is incompatible with the referred patient's interests, the health care worker is required to make alternative arrangements for the patient's care.  225 ILCS 47/20(b)(10) (West 1996).  It follows, then, that there is a potential conflict of interest, which the physician should disclose, where, incompatibly with the patient's interest, he has a financial interest in minimizing referrals or tests.

We find further support for requiring physicians to disclose any financial arrangements with insurers in Current Opinions of the Council on Ethical and Judicial Affairs of the American Medical Association (Current Opinions) (1996-1997 edition).  Section 8.132 of Current Opinions provides:

"Physicians must not deny their patients access to appropriate medical services based upon the promise of personal financial reward, or the avoidance of financial penalties.  Because patients must have the necessary information to make informed decisions about their care, physicians have an obligation to assure the disclosure of medically appropriate treatment alternatives, regardless of cost.

Physicians must assure disclosure of any financial inducements that may tend to limit the diagnostic and therapeutic alternatives that are offered to patients or that may tend to limit patients' overall access to care.
  Physicians may satisfy this obligation by assuring that the managed care plan makes adequate disclosure to patients enrolled in the plan."  (Emphasis added.) Current Opinions, §8.132 (1996-97). 

Plaintiff's expert, Dr. Jay Schapira, testified at his deposition that Current Opinions addresses the fact that there could be a conflict of interest in a physician's motivation, and when that possibility exists, the physician must disclose it to the patient.  Dr. Schapira explained that the standard of care requires a physician to divulge his financial interests in withholding care to a patient so that the patient can make an informed decision about the quality of care he is receiving and the physician's motivation in taking care of him, considering the trust situation between a physician and patient.  Defendants argue, however, that a violation of the AMA's medical ethics does not amount to a breach of the legal standard of care.  While we agree that a violation of the AMA's medical ethics does not in itself amount to a breach of the legal standard of care, such a violation certainly is relevant to determining whether a physician has breached his standard of care and certainly can form the basis of an expert's opinion that a physician has breached the standard of care.  As the Appellate Court, First District, has observed, "the ethics of the medical profession constitute more than just a set of regulations affecting members of a particular profession; they also grant the public, specifically a patient seeking a physician's help, an 
affirmative right
 to rely on his physician to faithfully execute those ethical obligations."  (Emphasis in original.)  
Petrillo
, 148 Ill. App. 3d at 592.  Thus, it would be antithetical to hold that the ethical obligations of a physician require him to disclose financial inducements that might tend to limit the diagnostic and therapeutic alternatives available to a patient and also, in determining whether a patient's physician has acted within the standard of care, to hold that a patient has no right to rely on his physician to faithfully execute his ethical obligation.

Our conclusion that a plaintiff may be able to plead a cause of action for breach of fiduciary duty separate from a claim for medical negligence finds further support in Illinois cases that have held that a plaintiff can allege claims for both legal malpractice and for breach of fiduciary duty against his attorney.  See 
Doe v. Roe
, 289 Ill. App. 3d 116 (1997); 
Coughlin v. SeRine
, 154 Ill. App. 3d 510 (1987).  Such claims, however, are not without limitation and not every claim for legal negligence also sets forth a claim for breach of fiduciary duty.  See 
Calhoun v. Rane
, 234 Ill. App. 3d 90 (1992).  Thus, where the allegations in a claim for breach of fiduciary duty are virtually identical to those set forth in a claim for legal negligence, it has been held that a cause of action for breach of fiduciary duty has not been properly pleaded and should be dismissed as duplicative.  
Calhoun
, 234 Ill. App. 3d at 95.  This result is similar to that reached by other jurisdictions that have held that a plaintiff could not state a claim for breach of fiduciary duty against his physician where that claim was duplicative of another claim in his cause of action. 

Turning to the facts of this case, then, we must examine the specific allegations in plaintiff's medical negligence claim and her breach-of-fiduciary-

duty claim to determine whether plaintiff has pleaded separate causes of action.  Plaintiff's medical negligence claim against defendants alleged that defendants breached the standard of care in that they (1) failed to provide appropriate care and treatment for Neade after he demonstrated signs and symptoms of coronary artery blockage; (2) failed to properly monitor Neade's condition; (3) unreasonably continued to rely on the results of the thallium stress test and EKG despite Neade's continuing symptoms; (4) failed to personally review the thallium stress test and EKG; (5) failed to take into account Neade's personal factors in combination with his symptoms; (6) failed to make an adequate differential diagnosis; (7) failed to eliminate the differential diagnosis of hiatal hernia or esophagitis; and (8) failed to order or allow an angiogram after Drs. Huang and Schlager recommended the test.  As a result of defendants' negligence, Neade suffered a massive myocardial infarction and subsequently died.

Plaintiff's breach-of-fiduciary-duty claim alleged that a fiduciary relationship existed between defendant Dr. Portes and Neade whereby Neade placed trust and confidence in Dr. Portes to act in Neade's best interests and that, pursuant thereto, Dr. Portes had a duty to act in good faith and in the best interests of Neade.  Plaintiff claimed that defendant Dr. Portes breached that duty by (1) refusing to order or allow further testing of Neade; (2) refusing to order or allow other specialists to examine or evaluate Neade; (3) failing to disclose the financial relationship that defendants had with Neade's health insurance carrier and that defendants would receive 60% of any monies not expended for the benefit of patients; (4) negotiated and entered into a contract with Chicago HMO that placed defendants' financial well-being in direct conflict with Neade's physical well-being; (5) failed to allow tests because those tests would reduce monies available to defendants; (6) refused to allow an angiogram because such test would reduce monies available to defendants; and (7) negotiated and entered into a contract with Chicago HMO that contained provisions that did not promote the quality of care of a patient such as Neade.  Plaintiff further alleged that, as a direct and proximate result of defendant Dr. Portes's breach of fiduciary duty, Neade suffered a massive myocardial infarction and died.

We find that the foregoing allegations allege two separate and distinct causes of action.  The claim for medical negligence is premised upon defendant Dr. Portes's allegedly improper reliance on the thallium stress test and EKG in deciding that further tests to rule out coronary artery blockage were not necessary, despite the recommendations of two other physicians.  The breach-of-

fiduciary-duty-claim is based upon defendant Dr. Portes's failure to disclose to Neade that he had a financial incentive to refrain from ordering any tests or referring Neade to a specialist to determine the cause of his symptoms.  In an affidavit attached to plaintiff's motion to reconsider, plaintiff alleged that, had Dr. Portes disclosed his financial relationship with the HMO, she would have questioned him regarding his refusal to approve the recommended angiogram and would have recommended that her husband obtain a second opinion or consult another primary physician. 

In so holding, we do not intend to open the floodgates of litigation, and we caution that not every claim for medical negligence will also set forth a claim for breach of fiduciary duty.  In this case, however, we find that plaintiff's claim for breach of fiduciary duty is not duplicative of her medical negligence claim.  It is conceivable that a trier of fact could find both that Dr. Portes was within the standard of care and therefore not negligent in relying on the thallium stress test and the EKG in deciding that an angiogram was not necessary and also  that Dr. Portes did breach his fiduciary duty in not disclosing his financial incentive arrangement and, as a proximate result thereof, Neade did not obtain a second opinion, suffered a massive coronary infarction, and died.  

In reaching our conclusion that plaintiff has stated a claim for breach of fiduciary duty, we disagree with the trial court that the decisions in 
Bearden v. Hamby
, 240 Ill. App. 3d 779 (1992), and 
Taber v. Riordan
, 83 Ill. App. 3d 900 (1980), are controlling and, in fact, find those cases to be inapposite to the present case.  
Bearden
 is not on point because it concerned whether a physician's motive was relevant in a medical negligence case, while the issue before us is whether plaintiff has pleaded an action for breach of fiduciary duty against defendants.

We also do not find this court's decision in 
Taber
 to be on point.  In that case, the plaintiff suffered injury to her femoral nerve following surgery to her right leg, although there was no dispute that the defendant had used due care in performing the operation and did not depart from community standards.  
Taber
, 83 Ill. App. 3d at 901.  Plaintiff brought a medical negligence claim against the defendant physician alleging that defendant had a duty to inform her of postoperative complications and to refer her to a specialist based upon the fiduciary relationship between a doctor and a patient.  
Taber
, 83 Ill. App. 3d at 903.  At trial, the court did not allow to go to the jury the issue of postoperative care, based upon plaintiff's claim that defendant never told her about her injury.  
Taber
, 83 Ill. App. 3d at 904.

On appeal, this court noted that there is little dispute that a doctor has a fiduciary relationship with his patient.  
Taber
, 83 Ill. App. 3d at 904.  The plaintiff argued that the fiduciary relationship between a doctor and his patient created a duty as a matter of law for the doctor to advise and not to withhold information that the plaintiff had received an injury during surgery and that a breach of that duty was actionable without medical testimony concerning the standard of care owed by a physician postoperatively.  
Taber
, 83 Ill. App. 3d at 904.  This court disagreed, noting that the existence of a fiduciary duty did not excuse a plaintiff from establishing the community standards of the postoperative care owed by a physician.  
Taber
, 83 Ill. App. 3d at 904.  

The 
Taber
 decision, however, is distinguishable from the present case.  In 
Taber
, the plaintiff claimed that an allegation of breach of fiduciary duty proved her medical negligence case without the need for evidence that the doctor's conduct fell below the standard of care.  
Taber
, 83 Ill. App. 3d at 904.  Here, plaintiff did not claim that she need only allege a fiduciary duty in order to prevail on her breach-of-fiduciary-duty count.  Further, as part of her motion to reconsider, plaintiff did submit the deposition testimony of Dr. Schapira stating that Dr. Portes had not acted within the applicable standard of care for physicians.  Dr. Schapira testified that the standard of care required a doctor to divulge his financial interests in withholding patient care so that the patient could make an informed decision about the quality of care he is receiving and the doctor's motivation in taking care of him.  Accordingly, in contrast to the plaintiff in 
Taber
, plaintiff in this case has alleged the standard of care with regard to the disclosure of financial incentive agreements and also has alleged that defendant breached that standard of care.  Under the circumstances, we find that plaintiff has adequately pleaded a claim against defendants for breach of fiduciary duty and that the trial court erred in dismissing count II of plaintiff's amended complaint.  We therefore reverse the trial court's dismissal of count II and remand the cause for further proceedings.

V.  NEGLIGENCE

Plaintiff also contends that the trial court erred in striking the allegations concerning the Medical Incentive Fund from her medical negligence claim.  Plaintiff claims that those allegations established a deviation from the standard of care.  In support of her argument, plaintiff points to both Dr. Schapira's deposition testimony that the failure to disclose the existence of the Medical Incentive Fund violated the applicable standard of care and to her own affidavit testifying that, had she known of Dr. Portes's financial motivation, she would have sought a second opinion.

Defendants respond that such allegations, going only to Dr. Portes's motivation, are irrelevant to a medical negligence action.  Defendants argue that if a physician has deviated from the standard of care, a plaintiff can recover regardless of the physician's motivation or incentive to deviate.  Conversely, if a physician did not deviate from the standard of care, a plaintiff cannot recover even if the physician had an improper motive or incentive.

In striking the disputed allegations from plaintiff's claim for medical negligence, the trial court held that the decision in 
Bearden v. Hamby
, 240 Ill. App. 3d 779 (1992), was controlling.  In 
Bearden
, the plaintiff brought a claim for medical negligence against the defendant physician and his professional corporation  alleging, 
inter
 
alia
, that the physician failed to transfer the decedent to a major university hospital that could have provided more intensive and suitable monitoring and treatment.  
Bearden
, 240 Ill. App. 3d at 781.  During discovery, the plaintiff learned that the physician's professional corporation had a contractual arrangement with the hospital to which decedent had been admitted, whereby the hospital paid the physician to manage certain units and also paid him to read and interpret certain tests.  
Bearden
, 240 Ill. App. 3d at 781.  Plaintiff then served the defendants with a notice to produce their income tax returns.  
Bearden
, 240 Ill. App. 3d at 782.  The defendants objected to the plaintiff's request for their income tax returns, and, after the defendants refused to comply with the trial court's order to produce the returns, the trial court held the defendants in contempt of court.  
Bearden
, 240 Ill. App. 3d at 781.  

On appeal, the plaintiff claimed that the income tax returns were necessary to establish the physician's motive for deviating from the standard of care.  
Bearden
, 240 Ill. App. 3d at 783.  The plaintiff's expert had testified at his deposition that the physician had deviated from the standard of care by failing to transfer plaintiff's decedent to a major university hospital and that the doctor's percentage contract with the hospital created an improper financial incentive to keep patients in that hospital when it was not medically appropriate.  
Bearden
, 240 Ill. App. 3d at 781.  However, the expert also testified that the doctor's contract with the hospital did not cause decedent's death.  
Bearden
, 240 Ill. App. 3d at 782.  In reversing the trial court's order of contempt, the appellate court held that the doctor's motive was not an element in a medical malpractice claim.  
Bearden
, 240 Ill. App. 3d at 783.  The court noted that "[t]he question is, did [defendant] deviate from the standard of care?  The reason, or motive, if any exists, is of no consequence."  
Bearden
, 240 Ill. App. 3d at 783.

Plaintiff claims that this court should not follow 
Bearden
 because that decision has never been cited and because issues concerning Dr. Portes's financial gain clearly go to his credibility.  She also contends that because Dr. Schapira testified that Dr. Portes deviated from the standard of care when he failed to disclose the existence of the Medical Incentive Fund, Dr. Portes's motive is relevant to her cause of action.  

We agree with plaintiff that issues concerning Dr. Portes's financial gain go to his credibility.  An expert witness's financial interest in a case is always relevant for purposes of cross-examination.  See 
Trower v. Jones
, 121 Ill. 2d 211, 218 (1988).  Any witness may be cross-examined about his interest or bias.  M. Graham, Cleary & Graham's Handbook of Illinois Evidence, §607.7 at 395-96 (6th ed. 1994).  Thus, we agree with plaintiff that information concerning the Medical Incentive Fund may be relevant at trial in the event Dr. Portes is called to testify concerning the allegations of medical negligence.  It does not necessarily follow, however, that issues of financial motive are properly pleaded as part of a medical negligence cause of action.  The allegations stricken from count I of plaintiff's complaint clearly go to Dr. Portes's motive in failing to order the angiogram.  Plaintiff has not alleged in count I that the failure to disclose the Medical Incentive Fund was a breach of the standard of care for medical negligence, nor did she allege in count I that the failure to disclose the Medical Incentive Fund proximately caused Neade's death.  The allegations of negligence, set forth in detail in the preceding section, are that Dr. Portes breached the standard of care when he relied on the thallium stress test and EKG data even though he knew those tests gave false negative results in 20% of cases; that Dr. Portes neglected to take into account Neade's personal risk factors in failing to order an angiogram or other test and failed to order an angiogram despite the recommendations of Drs. Huang and Schlager; and that, as a proximate result of these acts or omissions, Neade suffered a fatal myocardial infarction. Similarly to the court in the 
Bearden
 case, we find that Dr. Portes's motive is not an element of this cause of action.  If Dr. Portes was within the standard of care in relying on the thallium stress test and EKG data in deciding not to order an angiogram or other tests, plaintiff cannot recover for medical negligence regardless of his motive.  

We also note that to allow plaintiff to plead allegations concerning Dr. Portes's motive in count I, when we have held that those allegations go to a claim for breach of fiduciary duty, would create duplicative causes of action.  Additionally, we find that Dr. Schapira's testimony that it was a breach of the standard of care to fail to disclose the Medical Incentive Fund goes to the claim for breach of fiduciary duty and not to the medical negligence claim.  Dr. Schapira testified that "the standard of care is for the doctor to divulge these financial interests in withholding care to the patient so that the patient can make an informed decision about the quality of care he is receiving and the doctor's motivation in taking care of him 
considering that this is a trust situation
." (Emphasis added.) Because allegations concerning the Medical Incentive Fund did not constitute an element of plaintiff's claim for medical negligence, those allegations were properly stricken from count I of plaintiff's amended complaint.

For all of the foregoing reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded.

Affirmed in part and reversed in part; cause remanded.

GEIGER and RAPP, JJ., concur.