**Norma J. SPOOR and Charles H. Spoor, Plaintiffs–Appellants,**

v.

**Joseph F. SEROTA and Francis J. Martorano, Defendants–Appellees.**

**No. 91CA0592.**

Colorado Court of Appeals, Div. V.

Sept. 10, 1992.

As Modified on Denial of Rehearing Dec. 10, 1992.

Certiorari Denied June 7, 1993.

Bartholomew & Cristiano, Francis V. Cristiano, Denver, for plaintiffs-appellants.

Cooper & Kelley, P.C., Paul D. Cooper, Larry S. McClung, Denver, for defendant-appellee Joseph F. Serota.

Long & Jaudon, P.C., Michael T. McConnell, Denver, for defendant-appellee Francis J. Martorano.

Opinion by Judge RULAND.

In this medical malpractice action, plaintiffs, Norma J. Spoor and her husband, Charles H. Spoor, appeal from the judgment entered upon a jury verdict in favor of defendant Joseph F. Serota. Plaintiffs also appeal from the summary judgment entered in favor of defendant Francis J. Martorano. We affirm in part, reverse in part, and remand the case for further proceedings.

In the summer of 1987, Spoor developed an ulceration on her neck which apparently resulted from the radiation treatments she had received some years prior. After determining that the ulcer was benign, Spoor contacted Martorano to treat the open wound.

Martorano's treatment consisted of hyperbaric oxygen therapy, but that procedure was not successful. Consequently, Spoor consulted Serota, a plastic surgeon, regarding reconstructive surgery.

Serota and another plastic surgeon performed the operation. The original plan was to perform a myocutaneous flap procedure, whereby a muscle, with its connected skin tissue and blood supply, is taken from the patient's lower chest area and sutured over the ulcerated area. Serota testified, however, that during the surgery, he determined that the skin tissue associated with the muscle did not have adequate blood supply for this procedure.

As a result, Serota performed a muscle flap procedure. This procedure involved placing the muscle in the ulcerated area and then attaching a skin graft to it. If the procedure is successful, new blood vessels eventually grow into the skin flap to keep it alive.

Shortly after the surgery, it became apparent that a large portion of the skin graft or island in the upper part of Spoor's neck was no longer viable. Accordingly, a significant portion of the island was removed.

There was conflicting testimony as to why the island failed. Serota's expert witness testified that the failure was likely due to inadequate blood flow. He stated that this could have occurred for a number of reasons, including Spoor's alleged smoking of cigarettes until the date of surgery and the resultant constriction and narrowing of her blood vessels.

Spoor testified, however, that she had stopped smoking eight months prior to the operation. Further, plaintiffs' expert witness testified that "based upon a reasonable degree of probability," the skin island failed because it was inferior and inadequate and did not overlap the muscle adequately.

Spoor also testified that, after most of the island was removed, Serota failed to advise her that immediate follow-up surgery was necessary. Instead, according to her, Serota stated that the wound would heal by itself.

Serota, on the other hand, testified that, in October 1987, he discussed the possibility of further surgery with Spoor. He also testified that on December 2, 1987, he contacted a medical clinic for the purpose of initiating follow-up surgery. According to Serota, prior to that time, he was of the opinion that Spoor was not mentally prepared to undergo further surgical procedures.

In any event, in January 1988, Spoor traveled to an out-of-state medical clinic for further treatment. At this clinic, she underwent two additional surgeries whereby flaps were sutured to the ulcerated area. The first flap procedure failed, apparently because of infection. However, the second surgery proved successful.

I

■ Approximately 10 months prior to trial and after summary judgment in favor of Martorano had been granted, plaintiffs moved to amend the complaint in order to add a claim for breach of fiduciary duty against Martorano and Serota. The trial court denied this request. Relying primarily upon *Destefano v. Grabrian*, 763 P.2d 275 (Colo.1988), plaintiffs first contend that the trial court erred in denying their motion to amend. We disagree.

We recognize that, in other jurisdictions, the relationship between physician and patient has been characterized as a fiduciary one in the context, among other things, of obtaining informed consent from a patient for treatment. *See Moore v. Regents of University of California*, 51 Cal.3d 120, 271 Cal.Rptr. 146, 793 P.2d 479 (1990); *Keogan v. Holy Family Hospital*, 95 Wash.2d 306, 622 P.2d 1246 (1980). Similarly, a failure to obtain informed consent has been considered a breach of fiduciary duty in this jurisdiction in the context of the relationship between a real estate broker and the broker's client. *See Lestoque v. M.R. Mansfield Realty, Inc.*, 36 Colo. App. 32, 536 P.2d 1146 (1975).

In this case, however, we are unable to conclude that application of rules governing fiduciaries would lead to a different result. Specifically, plaintiffs alleged that Serota failed to exercise due care in performing the surgery, failed properly to advise Spoor about the surgery, failed to provide follow-up care, and failed to recommend additional surgery by the appropriate experts. The allegations against Martorano were that the hyperbaric oxygen treatment was useless.

In determining in *Destefano, supra,* that a marriage counselor owes a fiduciary duty to a client, our supreme court noted that this duty includes, among other things, a duty "to exercise reasonable care and skill" on behalf of the client. That same duty is imposed upon physicians under negligence theories and was the genesis of plaintiffs' claims here. *See Bowman v. Songer*, 820 P.2d 1110 (Colo.1991). Under these circumstances, we conclude that assertion of a claim for breach of fiduciary duty against Serota would have been duplicative, be-

cause the same issue was before the jury in the context of plaintiffs' negligence claims.

## II

Next, plaintiffs contend that the trial court erred in refusing their request to give the jury two tendered jury instructions and in giving another instruction over their objections. We agree as to one of the instructions. Because the issues may arise again on retrial, we address the other two instructions as well.

## A

■ First, plaintiffs argue that the trial court committed reversible error in failing to instruct the jury on the doctrine of *res ipsa loquitur*. We agree.

The following jury instruction on *res ipsa loquitur* was tendered by plaintiffs but rejected by the trial court:

> In determining whether or not the defendant was negligent, if you find that the plaintiff, Norma J. Spoor, incurred injuries caused by the July 17, 1987 operation, that such operation was in the exclusive control of the defendant, Joseph F. Serota, and that such injuries probably would not have been caused by such operation had the defendant exercised reasonable care, then the law presumes, the defendant was negligent....

The trial court ruled that the doctrine of *res ipsa loquitur* was inapplicable to this case because of evidence that a likely reason for the failure of the flap was an insufficient blood supply caused by Spoor's long history of cigarette smoking. Thus, the court determined that there was evidence which, if believed by the jury, would show comparative negligence. We conclude, however, that the legal test applied by the trial court was incorrect.

*Res ipsa loquitur* is a rule of evidence which defines the circumstances under which a presumption of negligence will arise as a matter of law. *Miller v. Van Newkirk*, 628 P.2d 143 (Colo.App.1980). This presumption occurs when an unexplained event creates a prima facie case of negligence without proof of specific misfea-

sance. *Holmes v. Gamble*, 624 P.2d 905 (Colo.App.1980), *aff'd*, 655 P.2d 405 (Colo. 1982).

As pertinent here, to establish a prima facie case of *res ipsa loquitur*, plaintiffs were required to present: (1) evidence that Spoor's injury does not ordinarily occur in the absence of negligence and, (2) evidence that would sufficiently eliminate responsible causes other than Serota's negligence. A former element which required that plaintiff establish the absence of both contributory negligence on her part and other causes has been eliminated. *Montgomery Elevator Co. v. Gordon*, 619 P.2d 66 (Colo. 1980).

Finally, in assessing whether plaintiff established a prima facie case, we must view the evidence and all legitimate inferences therefrom in a light most favorable to her. *Ravin v. Gambrell*, 788 P.2d 817 (Colo. 1990).

Here, plaintiffs' expert testified that this type of operation has a 95% success ratio. This expert had performed approximately 36 of the procedures and had suffered only one failure. In hindsight, he believed that the "failed" operation should have been successful as well.

The only other factors that he could identify which would cause the operation to fail, other than for malpractice reasons, consisted of radiation necrosis and infection. However, in this particular case, he excluded radiation and infections as possibilities based upon the medical reports.

The expert noted that there can be undetected twisting of an artery or the muscle selected for the flap procedure which then affects circulation. However, in this expert's view, extraordinary care can foreclose this difficulty.

The defendant's expert vacillated somewhat in his opinion of the success ratio for this type of operation, but he did concede that generally there was approximately a 90 to 95% success ratio. The expert indicated that causes other than malpractice for failure of the procedure consist of lack of enough blood vessels going from the muscle into the skin, spasm caused by

"rough handling" of the muscle selected for the flap, cigarette smoking, nicotine, coldness in the operating room, and a kinking of the blood vessels. Contrary to plaintiffs' expert, this physician felt that kinking of the vessels can arise without substandard care by the operating physician. However, the expert conceded that there was no information in the medical reports to indicate that kinking or rough handling had occurred.

The expert also conceded that, if the operating room was too cold, the muscle selected for the flap procedure could be warmed in warm water sponges before the procedure continued.

In explaining the operation's failure, this expert relied heavily on information indicating that plaintiff smoked up to the date of the surgery. However, the plaintiff testified otherwise. Finally, while the expert indicated a view that atherosclerosis might have been a causative factor, he had to concede that the Mayo Clinic was successful in performing the operation notwithstanding any atherosclerosis.

Viewing the record in a light most favorable to plaintiffs, as we must, we conclude that the evidence and inferences therefrom reflect that, more probably than not, plaintiffs' injuries were the result of Serota's negligence. Accordingly, we conclude that the trial court erred in refusing plaintiffs' request for a *res ipsa loquitur* instruction.

## B

Next, plaintiffs argue that the trial court erred in refusing their instruction on the "captain of the ship" doctrine. We disagree.

■■■ The "captain of the ship" doctrine, which is grounded in the doctrine of *respondeat superior,* imposes liability on a surgeon for the negligence of hospital employees under his control and supervision during surgery. Moreover, the surgeon in charge may also be held liable for the acts of other licensed physicians assisting in the operating room by virtue of selection and supervision. *Kitto v. Gilbert,* 39 Colo.App. 374, 570 P.2d 544 (1977).

Here, the record does not support a negligence claim against any party involved in the operation, with the exception of Serota. Hence, we conclude that the trial court was correct in rejecting the tendered instruction.

## C

■■■ Next, plaintiffs contend that the trial court erred in giving an instruction because, they argue, it was in conflict with prevailing law and because it was also confusing when read in conjunction with two other jury instructions. We find no merit in these contentions.

The challenged instruction is as follows:

In considering whether the defendant exercised ordinary and reasonable care, skill and diligence in treating plaintiff, you cannot set up a standard of your own, but must be guided in that regard solely by the testimony of the experts who have appeared in this action, in accordance with the instructions of the court as to the standard of care of physicians contained herein.

The two other instructions read:

A physician is negligent when the physician does an act which a reasonably careful physician would not do or fails to do an act which a reasonably careful physician would do.

To determine whether a physician's conduct was reasonably careful, that conduct must be measured against what a physician having and using that knowledge and skill of physicians practicing at the same time, would or would not have done under the same or similar circumstances.

A physician who holds him or herself out as having special skill and knowledge to perform a particular operation and follow-up care is negligent if that physician does an act which a reasonably careful physician possessing such special skill and knowledge would not do or fails to do an act which a reasonably careful physician possessing such special skill and knowledge would do.

To determine whether such a physician's conduct was reasonably careful, that conduct must be measured against what a physician having and using that knowledge and skill of physicians who hold themselves out as having the same special skill and knowledge, at the same time, would or would not have done under the same or similar circumstances.

Plaintiffs argue that the first instruction allows the jury to be guided only by expert testimony when determining whether defendant exercised reasonable care, whereas the other two instructions do not impose that limitation. In plaintiffs' view, the first instruction seems to "override" the other two instructions, thus, creating confusion. Further, since the last two instructions are patterned after the model Colorado Jury Instructions, and the first is not, plaintiffs contend that the first instruction must be deemed to conflict with prevailing law. We disagree with both contentions.

In *Clayton v. Hepp*, 31 Colo.App. 385, 504 P.2d 1117 (1972), this court addressed a similar issue. There, the trial court instructed the jury on the standard of care for a specialist and for a non-specialist. The court further instructed the jury that in determining whether the defendants exercised reasonable care in their medical diagnoses, the jury was to be guided solely by the testimony of the physicians who appeared in the action. The *Clayton* court concluded that: "All the instructions were pertinent, proper and necessary to the jury's deliberation...."

As in *Clayton*, we conclude that the instructions here were proper. Each instruction was based on separate rules of law, and there is no contention that expert testimony was unnecessary to support plaintiffs' claim.

We need not address plaintiffs' remaining contention of error.

The judgment dismissing all claims against Martorano is affirmed. The judgment dismissing the claims against Serota and awarding costs against plaintiffs is reversed, and the cause is remanded for a new trial consistent with the views expressed in this opinion.

NEY and VAN CISE,* JJ., concur.