(No. 87445.—

THERESE NEADE, as Independent Adm'r of the Estate of Anthony Robert Neade, Deceased, Appellee, v. STEVEN PORTES *et al.*, Appellants.

*Opinion filed October 26, 2000.*

434

HARRISON, C.J., dissenting.

Hinshaw & Culbertson, of Chicago (Michael F. Henrick, Stephen R. Swofford and Timothy G. Shelton, of counsel), for appellants.

Robert J. Hauser, of Sullivan, Smith, Hauser & Noonan, Ltd., of Waukegan, for appellee.

Michael L. Ile, Anne M. Murphy and Leonard Nel-

son, of Chicago, for *amicus curiae* American Medical Association.

Saul J. Morse and Robert John Kane, of Springfield, for *amicus curiae* Illinois State Medical Society.

John L. Nisivaco, of Terrence J. Lavin & Associates, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiff filed a three-count complaint in the circuit court of Lake County, two counts of which were directed against defendants Steven Portes and Primary Care Family Center. In count I, plaintiff alleged that defendants were liable for medical negligence, and in count II, plaintiff charged defendants with a breach of fiduciary duty. The principal issue in this appeal is whether, in a complaint alleging medical negligence, a patient has a cause of action for breach of fiduciary duty against a physician for that physician's failure to disclose incentives that exist under the physician's arrangement with the patient's health maintenance organization (HMO). We hold that a patient may not bring a breach of fiduciary duty claim against a physician under these circumstances.

## BACKGROUND

According to the allegations in plaintiff Therese Neade's complaint, plaintiff's husband, Anthony Neade, had a family history of heart disease, suffered from hypertension and a high cholesterol count, smoked heavily and was overweight. In 1990, at age 37, Mr. Neade began to exhibit symptoms of coronary artery blockage. Specifically, Mr. Neade experienced chest pain extending into his arm and shortness of breath. Mr.

Neade's primary care physician, Steven Portes, M.D., hospitalized Mr. Neade from August 10 through August 13, 1990. During this hospitalization, Mr. Neade received several tests, including a thallium stress test and an electrocardiogram (EKG). Dr. Thomas Engel (not a party to this appeal) found the results of the tests to be normal and diagnosed Mr. Neade with hiatal hernia and/or esophagitis. Mr. Neade was thereafter discharged.

After his hospitalization, Mr. Neade visited Dr. Portes on August 17, August 28 and September 24, 1990, at the Primary Care Family Center (Primary Care), complaining of continued chest pain radiating to his neck and arm. Relying on the results of the thallium stress test and EKG taken during Mr. Neade's hospitalization, Dr. Portes informed Mr. Neade that his chest pain was not cardiac related. In October 1990, Mr. Neade returned to Dr. Portes, this time complaining of stabbing chest pain. At the request of Dr. Portes, his associate, Dr. Huang, examined Mr. Neade. Dr. Huang recommended that Mr. Neade undergo an angiogram—a test that is more specific for diagnosing coronary artery disease than a thallium stress test. Dr. Huang was employed on a part-time basis at Primary Care and had no hospital privileges. Dr. Portes, as Mr. Neade's primary care physician, was responsible for ordering any necessary hospitalization or additional tests. Despite Dr. Huang's recommendation, Dr. Portes did not authorize an angiogram for Mr. Neade.

Mr. Neade again returned to Primary Care in June 1991, complaining of chest pain. Dr. Portes asked Dr. Schlager, another part-time physician at Primary Care, to examine Mr. Neade. After this examination, Dr. Schlager also recommended that Mr. Neade undergo an angiogram, but Dr. Portes, relying on the thallium stress test, did not authorize the angiogram and advised Dr. Schlager that Mr. Neade's chest pain was not cardiac related. Subsequently, on September 16, 1991, Mr. Neade

suffered a massive myocardial infarction caused by coronary artery blockage. Nine days later, Mr. Neade died.

Plaintiff's complaint alleges that Dr. Portes was the president of Primary Care and, as such, negotiated contracts with various organizations on behalf of himself and the clinic. Chicago HMO, of which Mr. Neade was a member, was one of the organizations with which Dr. Portes had contracted for the provision of services. According to plaintiff's complaint, Dr. Portes personally negotiated with Chicago HMO in 1990 and 1991 and agreed that Dr. Portes and his group would receive from Chicago HMO, *inter alia*, $75,000 annually. The $75,000 was to be used by Dr. Portes and his group to cover costs for patient referrals and outside medical tests prescribed for Chicago HMO members. This fund was termed the "Medical Incentive Fund."

Pursuant to the contract between Dr. Portes, Primary Care and Chicago HMO, any portion of the Medical Incentive Fund that was not used for referrals or outside tests would be divided at the end of each year between Primary Care's full time physicians and Chicago HMO, with the physicians receiving 60% of the remaining money and Chicago HMO receiving 40%. If the Medical Incentive Fund was exhausted prior to the end of the year, Dr. Portes and his group would be required to fund any additional consultant fees and outside tests. Plaintiff and Mr. Neade were not informed of this arrangement between Dr. Portes, Primary Care and Chicago HMO.

Count I of plaintiff's amended complaint alleges that Dr. Portes' reliance on the thallium stress test and EKG and his failure to authorize an angiogram constituted medical negligence which proximately resulted in Mr. Neade's death. In count I, plaintiff alleged facts regarding the Medical Incentive Fund. Count II of plaintiff's amended complaint alleges that Dr. Portes had a fiduciary duty to act in good faith and in the best interest of

Mr. Neade, and that he breached that duty by refusing to authorize further testing, by refusing to refer Mr. Neade to a specialist and by refusing to disclose to the Neades Dr. Portes' financial relationship (including the Medical Incentive Fund) with Chicago HMO. Count II further alleges that Dr. Portes breached his fiduciary duty by entering into a contract with Chicago HMO that put his financial well-being in direct conflict with Mr. Neade's physical well-being.

The trial court agreed with defendants' argument that financial motive was not relevant to whether Dr. Portes violated the applicable standard of care in treating Mr. Neade. The trial court therefore struck the allegations relating to the Medical Incentive Fund from count I. With respect to count II, the trial court found that there existed no cause of action against a physician for breach of fiduciary duty and granted defendants' motion to dismiss. Plaintiff thereafter filed a motion to reconsider, to which she attached her own affidavit and portions of the deposition of plaintiff's expert, Dr. Jay Schapira. Plaintiff's affidavit stated that, if she had known of the Medical Incentive Fund, she would have sought a second opinion from a physician outside of Dr. Portes' group concerning the necessity of an angiogram. In his deposition, Dr. Schapira stated that both the applicable standard of care and ethical considerations obligate a doctor to disclose his financial interest in withholding care. According to Dr. Schapira, a patient can then make an informed decision concerning the quality of care he is receiving and his doctor's motivations in treating him. Defendants filed a motion to strike the affidavit and deposition excerpts from plaintiff's motion to reconsider. The trial court denied defendants' motion to strike and also denied plaintiff's motion to reconsider.

On appeal, plaintiff argued that allegations concerning the Medical Incentive Fund are relevant to count I of

plaintiff's complaint, in which plaintiff alleged medical negligence, to show that Dr. Portes deviated from the standard of care. The appellate court determined that allegations relating to financial motive are not appropriate in a medical negligence claim, and affirmed the trial court's holding on this issue. However, the appellate court held that evidence relating to the Medical Incentive Fund may be relevant at trial to attack Dr. Portes' credibility if he testifies. The appellate court reversed the trial court's dismissal of count II and held that plaintiff stated a cause of action for breach of fiduciary duty against Dr. Portes for Dr. Portes' failure to disclose the Medical Incentive Fund. 303 Ill. App. 3d 799.

On appeal to this court, defendants argue for reversal of the appellate court's finding that: (1) a cause of action for breach of fiduciary duty exists for Dr. Portes' failure to disclose the Medical Incentive Fund; and (2) evidence of the Medical Incentive Fund is relevant in plaintiff's medical negligence action if Dr. Portes testifies at trial. We allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of plaintiff and the Illinois State Medical Society and American Medical Association to file an *amicus curiae* brief in support of defendant.

## ANALYSIS

A motion to dismiss under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1998)) is properly granted where the plaintiff fails to state a cause of action upon which relief can be granted. *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 391 (1999). We review a section 2—615 motion to dismiss *de novo*. *Abbasi*, 187 Ill. 2d at 391, citing *Vernon v. Schuster*, 179 Ill. 2d 338, 344 (1997).

### I. Breach of Fiduciary Duty

The primary issue in this appeal is whether plaintiff

can state a cause of action for breach of fiduciary duty against Dr. Portes for Dr. Portes' failure to disclose his interest in the Medical Incentive Fund. A fiduciary relationship imposes a general duty on the fiduciary to refrain from "seeking a selfish benefit during the relationship." *Kurtz v. Solomon*, 275 Ill. App. 3d 643, 651 (1995), citing *Collins v. Nugent*, 110 Ill. App. 3d 1026, 1036 (1982). Illinois courts have recognized a fiduciary relationship between a physician and his patient (*Witherell v. Weimer*, 118 Ill. 2d 321, 331 (1987); *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581, 587 (1986)), but Illinois courts have never recognized a cause of action for breach of fiduciary duty against a physician.

Though Illinois courts have never addressed the issue of whether a plaintiff can state a cause of action for breach of fiduciary duty against a physician, courts have rejected breach of fiduciary duty claims brought against attorneys on the basis that they are duplicative of negligence or malpractice claims. For example, our appellate court has held that where a claim for legal malpractice and a claim for breach of fiduciary duty are based on the same operative facts and result in the same injury to the plaintiff, the breach of fiduciary duty claim should be dismissed as duplicative. *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 273-74 (1995); *Calhoun v. Rane*, 234 Ill. App. 3d 90, 95 (1992).

Courts in other jurisdictions have dismissed claims for breach of fiduciary duty when those claims are duplicative of medical negligence claims. Such claims for breach of fiduciary duty have also been dismissed where they constitute an impermissible recasting of a medical negligence claim, even though plaintiff's complaint did not include a medical negligence claim. The appellate court in the case at bar discussed decisions from Minnesota, Colorado, Arizona and New Mexico. Each of these jurisdictions held that a breach of fiduciary duty claim is

duplicative of a negligence claim. 303 Ill. App. 3d at 809-10, citing *Hales v. Pittman*, 118 Ariz. 305, 309, 576 P.2d 493, 497 (1978); *D.A.B. v. Brown*, 570 N.W.2d 168 (Minn. App. 1997); *Garcia v. Coffman*, 124 N.M. 12, 19, 946 P.2d 216, 223 (App. 1997); *Awai v. Kotin*, 872 P.2d 1332, 1337 (Colo. App. 1993); *Spoor v. Serota*, 852 P.2d 1292, 1294-95 (Colo. App. 1992). For example, in *Brown*, the defendant physician prescribed the drug Protopin to a group of patients. Subsequently, the defendant and the distributor of Protopin were indicted for violating the Medicaid/Medicare Anti Kickback statute (42 U.S.C. §§ 1320(a) through 7b(b) (1994)). The distributor admitted that it made payments to the defendant in exchange for prescribing Protopin-related treatment. The plaintiff class, which consisted of the defendant's patients, filed suit against the defendant for breach of fiduciary duty for the defendant's failure to disclose the "kickback" scheme. The Minnesota appellate court upheld the trial court's dismissal of the plaintiffs' claim because it found that the "gravamen of the complaint sound[ed] in medical malpractice." *Brown*, 570 N.W.2d at 171. Specifically, the *Brown* court was concerned that plaintiffs would plead claims for breach of fiduciary duty, rather than medical malpractice, in order to avoid statutes of limitations and the requirement of proving actual injury. The *Brown* court found that creation of a new cause of action for breach of fiduciary duty was unnecessary, stating that "[a]ny breach of fiduciary duty that may have occurred during the doctor's prescription of medication to his patients arose while the doctor was examining, diagnosing, treating, or caring for his patients" and thus constituted a claim for medical negligence. *Brown*, 570 N.W.2d at 172.

In a case involving facts similar to the case at bar, the United States Supreme Court recently refused to recognize a breach of fiduciary duty under ERISA. *Pegram*

*v. Herdrich*, 530 U.S. 211, 147 L. Ed. 2d 164, 120 S. Ct. 2143 (2000). In *Herdrich*, the plaintiff, a member of the Carle Clinic Association, P.C., Health Alliance Medical Plans, Inc., and Carle Health Insurance Management Co., Inc. (collectively Carle), an HMO, visited her primary care physician complaining of groin pain. The following week, the physician found an inflamed mass in the plaintiff's abdomen. The physician required the plaintiff to wait eight days to receive an ultrasound at a Carle facility over 50 miles away. In the interim, the plaintiff's appendix ruptured, causing peritonitis. The plaintiff filed a suit for both medical malpractice against her physician and breach of fiduciary duty against Carle. The breach of fiduciary duty claim alleged that Carle's act of providing incentives for its physicians to limit medical care and procedures constituted a breach of fiduciary duty under ERISA. *Herdrich*, 530 U.S. at 216, 147 L. Ed. 2d at 173, 120 S. Ct. at 2147. The Supreme Court reversed the Seventh Circuit's determination that the plaintiff stated a cause of action for breach of fiduciary duty under ERISA. *Herdrich*, 530 U.S. at 237, 147 L. Ed. 2d at 186, 120 S. Ct. at 2158-59. The Supreme Court noted the nature of a breach of fiduciary claim against an HMO physician. The Court stated:

"[T]he defense of any HMO would be that its physician did not act out of financial interest but for good medical reasons, the plausibility of which would require reference to standards of reasonable and customary medical practice in like circumstances. That, of course, is the traditional standard of the common law. [Citation.] Thus, for all practical purposes, every claim of fiduciary breach by an HMO physician making a mixed decision [about a patient's eligibility for treatment under an HMO and the appropriate treatment for the patient] would boil down to a malpractice claim, and the fiduciary standard would be nothing but the malpractice standard traditionally applied in actions against physicians." *Herdrich*, 530 U.S. at 235, 147 L. Ed. 2d at 185, 120 S. Ct. at 2157.

See also B. Furrow, *Managed Care Organizations and Patient Injury: Rethinking Liability*, 31 Ga. L. Rev. 419, 484 (1997).

We find the reasoning in the foregoing cases persuasive in analysis of the case at bar and decline to uphold plaintiff's breach of fiduciary duty claim. The appellate court held that because plaintiff pled different facts in support of her breach of fiduciary duty claim from those facts pled in her medical negligence claim, she stated two separate causes of action. Though many of the facts pled in counts I and II are identical, in her breach of fiduciary duty claim, plaintiff did plead the additional fact that Dr. Portes failed to disclose the Medical Incentive Fund. However, as our appellate court in *Majumdar* stated, it is *operative* facts together with the injury that we look to in order to determine whether a cause of action is duplicative. In the case at bar, the *operative* fact in both counts is Dr. Portes' failure to order an angiogram for Mr. Neade. Plaintiff alleges in both counts that Mr. Neade's failure to receive an angiogram is the ultimate reason for his subsequent death. Plaintiff also alleges the same injury in both her medical negligence claim and her breach of fiduciary duty claim, namely, Mr. Neade's death and its effect on plaintiff and her family. We determine that plaintiff's breach of fiduciary duty claim is a representment of her medical negligence claim.

An examination of the elements of a medical negligence claim and breach of fiduciary duty claim illustrates the way in which a breach of fiduciary duty claim would "boil down to a malpractice claim." *Herdrich*, 530 U.S. at 235, 147 L. Ed. 2d at 185, 120 S. Ct. at 2157. To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the

deviation from the standard of care. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). Thus, the standard of care is the relevant inquiry by which we judge a physician's actions in a medical negligence case. Under a standard of care analysis, a defendant will be held to "the reasonable skill which a physician in good standing in the community would use in a similar case." *Newell v. Corres*, 125 Ill. App. 3d 1087, 1094 (1984). If a physician deviates from the standard of care and that deviation proximately causes injury to a patient, the physician is liable for damages caused by his medical negligence.

In contrast to an action for medical negligence, in order to state a claim for breach of fiduciary duty, it must be alleged that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 53 (1994); see also *Chicago City Bank & Trust Co. v. Lesman*, 186 Ill. App. 3d 697, 701 (1989) ("[a] cause of action for breach of fiduciary duty must set forth *** that a fiduciary relationship existed between the parties, that the trustee owed certain, specific duties to the plaintiff, that the trustee breached those duties, and that there were resulting damages"). In the case at bar, plaintiff alleged in her complaint that "as a direct and proximate result of Defendant's breach of fiduciary duty ***, Anthony Neade suffered a massive myocardial infarction." The appellate court agreed, holding that "[i]t is conceivable that a trier of fact could find *** that Dr. Portes did breach his fiduciary duty in not disclosing his financial incentive arrangement and, as a proximate result thereof, Neade did not obtain a second opinion, suffered a massive coronary infarction, and died." 303 Ill. App. 3d at 814.

In order to sustain a breach of fiduciary duty claim against Dr. Portes, plaintiff would have to allege, *inter*

*alia*, that: (1) had she known of the Medical Incentive Fund she would have sought an opinion from another physician; (2) that the other physician would have ordered an angiogram for Mr. Neade; (3) that the angiogram would have detected Mr. Neade's heart condition; and (4) that treatment could have prevented his eventual myocardial infarction and subsequent death. See, *e.g.*, *Newell*, 125 Ill. App. 3d at 1094. In order to prove the second element, plaintiff would have been required to present expert testimony that the expert, after examining Mr. Neade and considering his history, would have ordered an angiogram. This requirement relates to the standard of care consideration—the first prong in a traditional medical negligence claim—under which a physician is held to "the reasonable skill which a physician in good standing in the community would use." *Newell*, 125 Ill. App. 3d at 1094. That is precisely what plaintiff must prove to support her breach of fiduciary duty claim. As the Supreme Court stated in *Herdrich*, the breach of fiduciary duty claim "would boil down to a malpractice claim, and the fiduciary standard would be nothing but the malpractice standard traditionally applied in actions against physicians." *Herdrich*, 530 U.S. at 235, 147 L. Ed. 2d at 185, 120 S. Ct. at 2157. Thus, we need not recognize a new cause of action for breach of fiduciary duty when a traditional medical negligence claim sufficiently addresses the same alleged misconduct. The breach of fiduciary duty claim in the case at bar would be duplicative of the medical negligence claim.

An examination of the damages pled in plaintiff's complaint further supports our conclusion that a medical negligence claim sufficiently addresses plaintiff's injuries. While pleading in the alternative is generally permitted (see, *e.g.*, *Collins v. Reynard*, 154 Ill. 2d 48, 50 (1992)), duplicate claims are not permitted in the same complaint. Count I of plaintiff's amended complaint sounds in medi-

cal negligence committed by Dr. Portes. In count I, plaintiff alleges that Mr. Neade's death deprived plaintiff and her children of Mr. Neade's "companionship as well as other attributes that they would normally receive as wife and children respectively, now and in the future, as well as the support of money and valuable services which he had provided." Plaintiff requests $50,000 in addition to costs of the lawsuit in damages under count I. Count II of plaintiff's amended complaint attempts to state a cause of action for Dr. Portes' breach of fiduciary duty. The damages alleged in count II are identical to those alleged in count I. Here, though attempting to couch the claim in different terms, plaintiff is essentially pleading the same cause of action which caused the same damages.

Our decision to refrain from permitting the creation of this new cause of action finds additional support in statutory law. The Illinois legislature has placed the burden of disclosing HMO incentive schemes on HMOs themselves. The Illinois General Assembly recently enacted the Managed Care Reform and Patient Rights Act (hereinafter, the Managed Care Act), which states: "Upon written request, a health care plan shall provide to enrollees a description of the financial relationships between the health care plan and any health care provider ***." 215 ILCS 134/15(b) (West Supp. 1999). The Managed Care Act, effective on January 1, 2000, requires that managed care organizations disclose physician incentive plans to patients. Thus, the legislature has chosen to put the burden of disclosing any financial incentive plans on the HMO, rather than on the physician. The legislature has put the burden of disclosure on the entities that create financial incentive plans and require physicians to adhere to them. If the legislature had wished to place the burden of disclosing financial incentives on physicians, it could have done so.

Moreover, the outcome that would result if we were to allow the creation of a new cause of action for breach of fiduciary duty against a physician in these circumstances may be impractical. For example, physicians often provide services for numerous patients, many of whom may be covered by different HMOs. In order to effectively disclose HMO incentives, physicians would have to remain cognizant at all times of every patient's particular HMO and that HMO's policies and procedures. See, *e.g.*, M. Hall, *A Theory of Economic Informed Consent*, 31 Ga. L. Rev. 511, 525-26 (1997) ("[A] typical primary care physician in a metropolitan city may have a dozen or more contracts with managed care networks, while specialists may have several dozen or even a hundred. It is not feasible to ask physicians to keep track of the payment incentives and treatment rules for each of these many different plans, nor is this necessarily good public policy"). If we were to recognize a breach of fiduciary duty claim in the context of the case at bar, we fear the effects of such a holding may be unworkable.

Plaintiff and the appellate court rely on Current Opinions of the Council on Ethical and Judicial Affairs of the American Medical Association (AMA) in support of the argument that plaintiff can state a cause of action for breach of fiduciary duty against Dr. Portes for his failure to disclose the Medical Incentive Fund. Specifically, they rely on Opinion 8.132 entitled "Referral of Patients: Disclosure of Limitations," which states:

"Physicians must assure disclosure of any financial inducements that may tend to limit the diagnostic and therapeutic alternatives that are offered to patients or that may tend to limit patients' overall access to care. Physicians may satisfy this obligation by assuring that the managed care plan makes adequate disclosure to patients enrolled in the plan." AMA Council on Ethical and Judicial Affairs, Current Op. 8.132 (1995-2000).

As previously noted in this opinion, the Illinois legislature

determined that disclosure to patients is to be made by managed care plans.

In addition to AMA opinions, plaintiff and the appellate court also rely on *Herdrich v. Pegram*, 154 F.3d 362 (7th Cir. 1998), *Shea v. Esensten*, 107 F.3d 625 (8th Cir. 1997), and *Moore v. Regents of the University of California*, 271 Cal. Rptr. 146, 793 P.2d 479 (1990), to support the establishment of a cause of action for breach of a fiduciary duty by medical professionals. As discussed, the United States Supreme Court has reversed *Herdrich* and held that, under ERISA, a physician's "mixed" decisions about HMO eligibility and patient treatment is not a fiduciary decision. *Herdrich*, 530 U.S. at 237, 147 L. Ed. 2d at 186, 120 S. Ct. at 2158. *Shea* held that a plaintiff could state a cause of action *against an HMO* for breach of fiduciary duty under ERISA for the HMO's failure to disclose physician incentive schemes. *Shea*, 107 F.3d at 629. The *Shea* court, like the Illinois General Assembly, placed the burden of disclosing financial incentive plans on the entity that both creates those plans and is more equipped to make those disclosures—the HMO. However, the issue of whether an HMO breaches its fiduciary duty in failing to disclose incentive schemes is not before us today. As our appellate court pointed out, both *Herdrich*, before it was reversed, and *Shea* "recognize that patients should be informed of financial arrangements that may negatively impact their health care." 303 Ill. App. 3d at 808. While we may agree that patients should be told of financial considerations which may negatively impact their health care, we will not place the burden of that disclosure on physicians.

Moreover, plaintiff's reliance on *Moore* is misplaced. *Moore* involved a plaintiff who alleged that his doctor breached his fiduciary duty when the doctor used portions of the plaintiff's spleen and other cells, which he recommended be removed, to conduct research and bene-

fit financially without informing the plaintiff. *Moore*, 271 Cal. Rptr. at 148, 793 P.2d at 481. The California appellate court held that the plaintiff could state a cause of action for *either* breach of fiduciary duty or for the performance of medical procedures without informed consent. *Moore*, 271 Cal. Rptr. at 150, 793 P.2d at 485. However, a physician's failure to disclose HMO incentive plans is significantly unlike the egregious nature of the alleged behavior at issue in *Moore*. Further, in *Moore*, the plaintiff had no way of discovering the physician's research plans unless disclosed by his physician. In Illinois, a patient can obtain information about the relationship and payment practices between her physician and her HMO by contacting the HMO.

Plaintiff also cites numerous cases that allow breach of fiduciary duty claims against professionals other than physicians. See *Doe v. Roe*, 289 Ill. App. 3d 116 (1997); *Regnery v. Meyers*, 287 Ill. App. 3d 354 (1997); *Winston & Strawn v. Nosal*, 279 Ill. App. 3d 231 (1996); *Kurtz v. Solomon*, 275 Ill. App. 3d 643 (1995); *Newton v. Aitken*, 260 Ill. App. 3d 717 (1994); *Lossman v. Lossman*, 274 Ill. App. 3d 1 (1995); *Progressive Land Developers, Inc. v. Exchange National Bank*, 266 Ill. App. 3d 934 (1994); *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355 (1994); *In re Estate of Savage*, 259 Ill. App. 3d 328 (1994); *Glass v. Burkett*, 64 Ill. App. 3d 676 (1978). These cases are inapposite, as the plaintiffs in those cases did not bring causes of action sounding in both breach of fiduciary duty and negligence. Thus, the courts in the cited cases did not determine whether the plaintiffs' injuries were sufficiently addressed by traditional negligence claims.

In *Coughlin v. SeRine*, 154 Ill. App. 3d 510 (1987), on which plaintiff also relies, the appellate court permitted a plaintiff to bring a cause of action for both professional malpractice and breach of fiduciary duty against his attorney. Unlike the case at bar, however, Illinois courts

have long recognized a cause of action for breach of fiduciary duty by an attorney. Thus, the *Coughlin* court was not confronted with the determination of whether to create a new cause of action. Furthermore, apparently no argument was raised regarding whether the malpractice and breach of fiduciary duty claims were duplicative. Consequently, the *Coughlin* court engaged in no discussion regarding the potential duplicative nature of those claims. We therefore do not find the *Coughlin* case to be pertinent to our decision today.

We decline to recognize a new cause of action for breach of fiduciary duty against a physician for the physician's failure to disclose HMO incentives in a suit brought against the physician for medical negligence. We hold that, under the facts in the case at bar, a breach of fiduciary duty claim is duplicative of a medical negligence claim. The injuries suffered by plaintiff as a result of Dr. Portes' medical care are sufficiently addressed by application of traditional concepts of negligence.

## II. Evidence of Financial Incentives at Trial

The appellate court held that evidence of the Medical Incentive Fund may be relevant in the event that Dr. Portes testifies in the medical negligence trial. 303 Ill. App. 3d at 817. The appellate court noted that, in general, a witness may be cross-examined on issues relating to interest and bias, and found that "issues concerning Dr. Portes' financial gain go to his credibility." We agree. Therefore, we hold that evidence of the Medical Incentive Fund may be relevant if Dr. Portes testifies at trial. The relevance and admission of such evidence is for the discretion of the trial court.

## CONCLUSION

For the foregoing reasons, we hold that plaintiff may not state a cause of action for breach of fiduciary duty against Dr. Portes. Therefore, we reverse the appellate

court's reinstatement of count II. The judgment of the circuit court is affirmed, and the cause is remanded to that court for further proceedings.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment affirmed;*
*cause remanded.*

CHIEF JUSTICE HARRISON, dissenting:

A complaint against a lawyer for professional malpractice may be couched in either contract or tort. *Collins v. Reynard*, 154 Ill. 2d 48, 50 (1992). In accordance with this principle, our appellate court has recognized legal malpractice claims grounded in breach of contract, negligence, and breach of fiduciary duty. *Hanumadass v. Coffield, Ungaretti & Harris*, 311 Ill. App. 3d 94, 99-100 (1999). Such claims are not mutually exclusive. Recovery may be sought in the alternative. *Collins*, 154 Ill. 2d at 50.

The same rule should apply here. Although this case involves medical rather than legal malpractice, that distinction is insignificant. For purposes of professional malpractice actions, medical doctors possess no special characteristics warranting different treatment than we afford lawyers. As with lawyers and their clients, doctors not only owe their patients a duty of due care. They also owe them a fiduciary duty. See *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581, 587-88 (1986).

The right to assert claims for breach of fiduciary duty and negligence in the same professional malpractice action is not unfettered. When the same operative facts support a negligence count and a count for breach of fiduciary duty based on the same injury to the client, the counts are identical and the fiduciary duty count should be dismissed as duplicative. See *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 273-74 (1995); *Calhoun v. Rane*, 234 Ill. App. 3d 90, 95 (1992). In this case, however, the negli-

gence and breach of fiduciary duty counts asserted by plaintiff are not identical. As the appellate court correctly recognized,

> "It is conceivable that a trier of fact could find both that Dr. Portes was within the standard of care and therefore not negligent in relying on the thallium stress test and the EKG in deciding that an angiogram was not necessary and also that Dr. Portes did breach his fiduciary duty in not disclosing his financial incentive arrangement and, as a proximate result thereof, Neade did not obtain a second opinion, suffered a massive coronary infarction, and died." 303 Ill. App. 3d at 814.

When my colleagues write that "[t]he injuries suffered by plaintiff as a result of Dr. Portes' medical care are sufficiently addressed by application of traditional concepts of negligence" (193 Ill. 2d at 450), it is clear to me that this distinction has been lost on them. Dr. Portes' failure to disclose that he had a financial incentive to deny the test recommended by his two associates and required by plaintiff's husband triggers separate policy considerations and constitutes an independent wrong.

Physicians have professional ethical, moral and legal obligations to provide appropriate medical care to their patients and should not allow the exercise of their medical judgment to be corrupted or controlled. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 45-46 (1999). At a time when HMOs are playing an ever-increasing role in how patient care is administered, these obligations are being tested as never before. In response, AMA guidelines now require physicians to assure disclosure to patients of any financial inducements that may tend to limit the diagnostic and therapeutic alternatives that are offered to patients or that may tend to limit patients' overall access to care. In addition, according to documentation and deposition testimony in this case, current standards of care require a physician to divulge his financial interests in withholding care to a patient so that the patient can make an informed decision about

the quality of care he is receiving and the physician's motivation in taking care of him.

In Illinois, the importance of making patients aware of possible financial conflicts of interest on the part of their physicians is reflected in the Health Care Worker Self-Referral Act (225 ILCS 47/1 *et seq.* (West 1998)). That law imposes stringent conditions upon when a physician or other health care worker may refer a patient to another office or group practice in which the physician or health care worker is an investor. It also requires the physician or health care worker to disclose to the patient his investment interest in the other office or group practice when he or she is not providing the health care service directly. The importance of making patients aware of possible financial conflicts of interest is further reflected in the new Managed Care Reform and Patient Rights Act (215 ILCS 134/1 *et seq.* (West Supp. 1999)), enacted during the pendency of this case, which requires health plans to disclose to enrollees, upon their written request, a description of the financial relationships between the health care plan and any health care provider (215 ILCS 134/15(b) (West Supp. 1999)).

It is ironic that the majority should invoke the provisions of the Managed Care Reform and Patient Rights Act to defeat plaintiff's claim in this case. The Act reflects the General Assembly's determination that patients have the right "to care consistent with professional standards of practice to assure quality nursing and medical practices, to choose the participating physician responsible for coordinating his or her care, [and] to receive information concerning his or her condition and proposed treatment." 215 ILCS 134/5(a)(1) (West Supp. 1999). One way the Act helps protect this right is by requiring HMOs to disclose the financial relationships between the health care plan and the health care providers in the plan. There is nothing in the Act, however, which suggests that an

HMO's duty of disclosure in any way supplants or supercedes the independent legal and ethical duty which a physician has to divulge his financial interests in withholding care to a patient. Indeed, to construe the Act as excusing physicians from their own disclosure obligations would actually diminish patients' access to information and thereby undermine the very purpose of the law.

Enabling health plan participants to make written requests for disclosure of the financial relationship between the plan and the plan providers is important when patients are selecting health plans and care providers. It is of limited benefit where, as here, a patient is already in the plan, under the care of a plan provider, and is facing treatment choices that have immediate and life-threatening consequences. If there is any possibility that the course of treatment recommended by the care provider may be affected by the remuneration he stands to receive from a third party, the patient has the right to know about it and the care provider has the obligation to make disclosure.

The physician's duty of disclosure must be self-executing. It should not depend on whether a patient specifically asks, and it should certainly not depend on submission of written requests. Patients facing catastrophic health problems may be physically or psychologically incapable of making the necessary inquiries. Even if they are, they may not think to do it. Most people trust their doctors and would never imagine that their own physician might be withholding necessary medical care for personal, financial reasons.

I am not moved by the majority's concern that requiring doctors to fulfill their duty of disclosure will be unduly burdensome. Doctors share generously in the bounty provided by modern medicine, and there is no reason to believe that they cannot manage or afford the administra-

tive tools necessary to keep them fully apprised of the payment incentives affecting a particular patient's care. Indeed, there is every reason to believe that payment incentives are one aspect of health care plans that physicians such as Dr. Portes will have no trouble at all keeping track of. According to the allegations in plaintiff's complaint, which must be taken as true (*Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 490 (1996)), Dr. Portes was well aware that the referral recommended by his associates and needed by plaintiff's husband would reduce the profit he would receive from the health plan. That is exactly why he refused to make the referral, and it is why plaintiff's husband is now dead.

For the foregoing reasons, I would hold that plaintiff should be allowed to proceed with her claim for breach of fiduciary duty as well as her claim for negligence. I therefore dissent.