JUSTICE GARCIA, dissenting: I am persuaded by Dr. Elias’s argument that the circuit court deviated from the Illinois Supreme Court’s holding in Neade v. Portes, 193 Ill. 2d 433, 739 N.E.2d 496 (2000), by admitting evidence, according to the plaintiffs own brief, that Dr. Elias had “a financial incentive for him to interpret the results of the discogram as an indication for the subsequent spinal surgery to be performed by him.” (Emphasis added.) More fundamentally, I question the legitimacy of the plaintiffs theory that Dr. Elias violated the standard of care for an orthopedic surgeon by “personally performing the discogram on Mr. Martinez” when Dr. Elias also performed the endoscopic discectomy and the IDET procedure, both of which he determined were medically warranted based on the results of the discogram. I fault the plaintiffs theory because no case is presented that permits the performance of a medical procedure to be characterized as violating the applicable standard of care without faulting the performance of the medical professional in carrying out the medical procedure itself. The plaintiff deems it malpractice whenever an orthopedic surgeon performs a discogram on a patient when the same surgeon may perform additional surgery, as the diagnostic results of the discogram dictate, without regard to whether the discogram itself was properly performed. The plaintiffs theory suggests that an orthopedic surgeon has a duty not to perform both the discogram and any subsequent spinal surgery because there is a financial incentive for the orthopedic surgeon to interpret the results of the discogram in favor of subsequent spinal surgery. I believe such a theory is the equivalent of a fiduciary duty claim in the context of a medical malpractice suit, which our supreme court disavowed. Neade, 193 Ill. 2d at 450 (“We decline to recognize a new cause of action for breach of fiduciary duty against a physician for the physician’s failure to disclose [financial] incentives ***”). Medical Negligence To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician’s treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care. Purtill v. Hess, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986). I believe the evidence falls short in this case on the key elements of the standard of care and proximate cause. Even accepting the plaintiffs theory that the endoscopic discectomy and the IDET were medically unnecessary and that the performance of each injured the plaintiff, that Dr. Elias performed the discogram, rather than another physician, says little about whether the endoscopic discectomy or the IDET should have been performed where the plaintiffs evidence was that there is a high incidence of false positives with the discogram. Stated differently, given the high incidence of false positives in the discogram procedure, proximate cause between Dr. Elias’s performance of the discogram and the injury the plaintiff allegedly suffered by the performance of the endoscopic discectomy and the IDET is at best tenuous. Even if an independent orthopedic surgeon had performed the discogram, based on the purported high incidence of false positives, that medical professional might well have determined that the endoscopic discectomy and the IDET were medically warranted. If the endoscopic discectomy and the IDET were determined to be medically warranted based on the results of an independently performed discogram, it necessarily follows that there is no nexus between Dr. Elias performing the discogram and his performance of the endoscopic discectomy and the IDET on the plaintiff, which he found medically warranted based on the results of the discogram. See Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 976, 691 N.E.2d 1 (1997) (no medical link between the alleged negligence in the delay in performing a CT scan and any neurosurgery, which might have been indicated, when the damage to the decedent’s brain was beyond surgical help); Scardina v. Nam, 333 Ill. App. 3d 260, 271, 775 N.E.2d 16 (2002) (alleged failure to properly read the radiological film did not impact surgeon’s examination of the plaintiffs colon during the subsequent surgery). Apart from proximate cause, I also question the standard of care evidence. The standard of care is the relevant inquiry by which we judge a physician’s actions in a medical negligence case. Under a standard of care analysis, a defendant will be held to “the reasonable skill which a physician in good standing in the community would use in a similar case.” Newell v. Corres, 125 Ill. App. 3d 1087, 1094, 466 N.E.2d 1085 (1984). Only if a physician deviates from the standard of care, by demonstrating less than reasonable skill, can the physician he held liable for medical negligence. Here, the jury was instructed that as to this claim by the plaintiff, Dr. Elias was negligent in that he “relied on a discogram that he personally performed.” Yet, the skill of Dr. Elias in performing the discogram was never questioned. No medical expert testified that Dr. Elias performed the discogram with less than “the reasonable skill which a physician in good standing in the community would use in a similar case.” Instead, Dr. Elias was faulted for performing the disco-gram “personally.” This, I submit, was at best a “judgment” call on the part of Dr. Elias, with which the plaintiffs experts disagreed.[2] I cannot agree that the standard of care in this case directs that a “treating physician and a potentially operating surgeon [cannot] be the same person performing the discogram in a patient” as Dr. Skaletsky testified. Whether the “treating physician and a potentially operating surgeon” are the same person says absolutely nothing about “the reasonable skill which a physician in good standing in the community would use in a similar case.” Newell, 125 Ill. App. 3d at 1094. The reason for my categorical statement is evident: Had Dr. Skaletsky himself performed the discogram on Mr. Martinez, the diagnostic result of the discogram may very well have been the same as the result Dr. Elias reached. While we do not know, I submit, the record evidence was insufficient to allow the jury to conclude that the standard of care required someone other than Dr. Elias perform the discogram when it cannot be denied that the same result might have been obtained had the discogram been performed by another physician. The plaintiffs experts’ opinions to the contrary amounted to no more than their own personal preference for having an independent orthopedic surgeon perform the discogram. “It is insufficient for plaintiff *** merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of professional judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care.” Walski v. Tiesenga, 72 Ill. 2d 249, 261, 381 N.E.2d 279 (1978). I submit the evidence regarding the standard of care is lacking where the plaintiffs claim amounts to no more than Dr. Elias “personally performed” the discogram. I cannot agree that this medical malpractice theory put forth by the plaintiff was a legitimate means of calling into question Dr. Elias’s medical skills. Because I find that the plaintiffs theory of malpractice as to Dr. Elias’s performance of the discogram amounts to no more than a fiduciary duty claim, the presentation of this claim to the jury is reversible error. Neade, 193 Ill. 2d at 450 (“We decline to recognize a new cause of action for breach of fiduciary duty against a physician for the physician’s failure to disclose [financial] incentives ***”). I reject the plaintiffs claim that on the record evidence before us, the standard of care required someone other than Dr. Elias perform the discogram. I find the evidence of the proximate cause element of this claim that Dr. Elias committed malpractice lacking. The plaintiff can make no showing of any injury proximately resulting from Dr. Elias’s performance of the discogram because the plaintiff is unable to demonstrate that the discogram result would have differed had Dr. Skaletsky or some other orthopedic surgeon performed the discogram instead. Evidence of Financial Incentive In his brief, the plaintiff seeks to support the introduction of “financial interest” evidence because “the introduction of this evidence was limited and specific to the issue of the defendants’ compliance with the standard of care.” The plaintiff claims, “the evidence of financial incentive goes to the heart of the breach of the standard of care by the physician.” I note no authority is cited for the introduction of such evidence even where its purpose is “limited and specific.” The plaintiff seeks to distinguish the decision in Bearden v. Hamby, 240 Ill. App. 3d 779, 608 N.E.2d 282 (1992), with his claim that the plaintiff in Bearden sought the defendant doctor’s tax returns “to establish the reason why the defendant physician breached the standard of care” (emphasis in original), claiming the financial incentive evidence in his case goes to “how” the defendant breached the standard of care. I fail to see the distinction between “how” and “why” evidence as to a claimed breach of the standard of care; nor am I persuaded that the jury would understand the difference. I submit the distinction between how and why is illusory in the absence of any authority that establishes such “legal” concepts in Illinois jurisprudence. In any event, our supreme court has made clear that only one reason is available to introduce financial incentive evidence—to demonstrate possible bias on the part of the physician, which is possible only during cross-examination of the physician. Neade, 193 Ill. 2d at 450 (“capitation fund” evidence relevant only for impeachment purposes). In an effort to place the financial incentive evidence within the Neade ruling that such evidence may be admissible to demonstrate bias, the plaintiff claims his contention was “that the testimony of Dr. Elias that his performance and interpretation of the discogram supported his recommendation for surgery goes to his interest and bias for performing and interpreting the discogram in that manner. The testimony of plaintiffs experts was that Dr. Elias deviated from the standard of care by performing and interpreting the discogram precisely because he had a financial interest in performing the ultimate surgery.” In Neade, the “financial incentive arrangement” was offered as an explanation for the defendant doctor’s decision not to order a second opinion. Neade, 193 Ill. 2d at 444. The allegation was that the defendant doctor failed to order the second opinion because the defendant doctor would pocket funds not used to cover such referrals and, thus, had a financial incentive to put his own interest above the patient’s. Unlike in Neade, I see no connection between Dr. Elias personally performing the diseogram and the suggestion that the results of the diseogram might be influenced because Dr. Elias would be paid for performing any additional surgery. I submit the concept that a doctor is remunerated for medical procedures conducted is grossly distorted when the remuneration itself is introduced as evidence of a “potential appearance of a vested interest from a surgical as well as financial outcome of the operating surgeon being the same one to perform the study,” as Dr. Skaletsky testified to support the plaintiffs claim of an alleged breach of the standard of care. In other words, I reject the plaintiff’s implied claim that the financial incentive evidence, which the supreme court held may be admitted to demonstrate bias in Neade, is equivalent to the astonishingly obvious concept that Dr. Elias would be paid for the performance of the endoscopic discectomy and the IDET procedures. In Neade, the plaintiff alleged that the defendant doctor was improperly influenced by the contract he had with the HMO that gave the doctor an incentive to reject outside test referrals where the doctor would receive 60% of any of the allocated funds not expended for such outside test referrals. Neade, 193 Ill. 2d at 437-38. That is a far cry from the plaintiffs claim here that Dr. Elias personally performing the diseogram gave rise to a financial incentive because Dr. Elias would be paid for any subsequent surgeries if he determined that the endoscopic discectomy and the IDET procedures were medically warranted based on the results of the diseogram. The plaintiffs claim that the “plaintiffs experts’ opinions could not logically have been presented to the jury without an explanation as to the reason that interpretation of the diseogram by the operating surgeon falls below the standard of care” simply seeks to prove too much. Whether the explanation gave logic to the experts’ opinions, I submit the opinions that Dr. Elias should not have personally performed the diseogram should not have been admitted at all. The experts’ opinions amounted to no more than “personal preferences” for having an independent orthopedic surgeon perform the diseogram. See Walski, 72 Ill. 2d at 259, 261 (“It is insufficient for plaintiff *** merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science”). The circuit court’s admission of the plaintiffs evidence that Dr. Elias personally performed the discogram and then was remunerated for the endoscopic discectomy and the IDET procedure that he determined were medically warranted by the results of the discogram, under the guise of a deviation of the standard of care as presenting some sort of improper financial motivation, was reversible error under Neade. I would remand for a new trial. I dissent. Even the language used by Dr. Skaletsky to describe the controversy within the medical community over the diagnostic role of discograms suggests it is a matter of judgment. The discogram is controversial “[b]ecause the reliance upon a purely subjective response is considered by many inappropriate in its usage to direct a potential surgical procedure.” (Emphasis added.)