In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-4042

CLARENCE GROSS,

*Plaintiff-Appellant,*

*v.*

TOWN OF CICERO, ILLINOIS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 9465—**John W. Darrah**, *Judge.*

ARGUED FEBRUARY 10, 2009—DECIDED AUGUST 27, 2010

Before CUDAHY, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Plaintiff Clarence Gross got more than he bargained for when he sued his former employer, the Town of Cicero ("the Town" or "Cicero"), and several related individuals for what he believed to be an unconstitutional firing. The Town countersued and won on a breach of fiduciary duty theory, while defeating Gross's constitutional claims in the process. After a bench trial, Gross was stuck with a judgment of

over $300,000, which constituted a forfeiture of his entire salary for over four years of work as a public servant. Gross appeals, challenging everything but the kitchen sink—the denial of his constitutional claims, the merits of the Town's fiduciary duty claim, the rejection of his demand for a jury trial, the judgment amount, and many more. In the end, Gross gets a split victory. We affirm the grant of summary judgment on his constitutional claims, but we reverse summary judgment granted in the Town's favor on its fiduciary duty claim.

## I. Background

In 1997, Gross retired as a Cicero police officer and was appointed to a variety of positions within the Town of Cicero's municipal government. He served as Director of Internal Services, Deputy Liquor Commissioner, and a member of the "911 Board." Most important for this case, though, was his involvement with the Board of Fire and Police Commissioners ("BOFPC"), to which the Town President (similar to a mayor) appointed him Hearing Officer and Chairman for a three-year term from 1998-2000, and later for a second term. Gross served the Town of Cicero in some capacity through October 2002, though he was removed from (or not reappointed to) certain positions before then. Gross was paid a single annual salary for all his various government positions, which was between around $61,000 and $66,500 annually (he received a little over $50,000 for his service through October 2002).

As Chairman of the BOFPC, Gross oversaw the hiring and discipline of Cicero police officers. Cicero had estab-

lished screening, evaluation, and hiring procedures. Throughout his tenure, a number of officers were hired to the force.

Gross admitted in his deposition that he hired a dozen or so individuals whom he felt at the time were "unqualified" to be police officers. Many of these individuals had performed poorly on one or more aspects of the evaluation criteria. But he hired them anyway, he testified, because Town President Betty Loren-Maltese told him to. On at least one occasion, Gross hired an individual without notifying the other BOFPC members about the prospective officer's documented poor performance on certain evaluations. Gross also admitted that he never told the other BOFPC members that Loren-Maltese instructed him to make certain hires. Gross viewed Loren-Maltese as his superior and testified that he believed Loren-Maltese had the legal authority to override his appointment decisions. Gross also admitted that he was worried about his and his daughter's employment if he failed to comply with Loren-Maltese's orders: "Town president tells you to hire somebody, sir, you hire them. I didn't wish to be fired. I wasn't going to get into an argument with her. And if I didn't do it, I would be terminated and my daughter would suffer the wrath."

As it turns out, Gross's daughter, Rhonda, had also been hired to the police force during Gross's tenure as Chairman. Shortly after being hired, Rhonda complained to her father that she and other female police officers were suffering sexual harassment, and in some cases abuse, at the hands of police commander Jerold Rodish. In re-

sponse, Gross claims that he approached Loren-Maltese on six or so occasions to talk with her about these issues. But each time, Gross wouldn't say much. Typically, Gross would come in and tell Loren-Maltese that he wanted to talk about "a situation still going on with Rhonda" or "a problem that's just escalating . . . regarding Rhonda." And each time Loren-Maltese would tell him that she knew what he was there for, "what it's about," and that she would talk to him later. Gross admitted in his deposition that he never mentioned Rodish, the police department, any of the other female officers, or any allegations of sexual harassment. The last time he broached the issue, Gross claims that Loren-Maltese told him to "just call Eddie," referring to Edward Vrdolyak, an outside lawyer retained to represent the Town in certain matters.

Not getting anywhere with Loren-Maltese, Gross claims he told his daughter to file a charge with the Equal Employment Opportunity Commission ("EEOC"). Rhonda filed a charge in June 2001; the Town was represented by Vrdolyak's law firm. The matter was later settled after the EEOC found, in June 2002, that there was substantial evidence that Rhonda was subjected to sexual harassment.

Around this time, Gross began to lose some of his Cicero posts. Gross claims that Loren-Maltese was responsible for removing him from several positions. Gross was no longer on the 911 Board by October 2001. Then, in January 2002, Gross claims that Loren-Maltese terminated him as Chairman of BOFPC, allegedly prior to the

end of his second, three-year term. Loren-Maltese stated that she could no longer trust Gross and his daughter due to "this EEOC thing" and that Rhonda "was lucky she had a job." Finally, in late September 2002, Gross claims that Ramiro Gonzalez, the new Town President, terminated him as Deputy Liquor Commissioner and Director of Internal Services. Gross alleges that, after he learned of his termination, he phoned Vrdolyak, who said "I cannot understand why she did this to you." Gross understood "she" to mean Loren-Maltese.

That wasn't the only time Gross talked to Vrdolyak, though. In late 2002 and early 2003, Gross spoke with and wrote letters to Vrdolyak about past compensation Gross had not yet received. Then, several months later, Gross claims that he became involved as a potential witness in litigation against the Town, filed by a man named Moreno. He claims that he talked with the plaintiff's attorneys about what he knew and that the attorneys put him on their witness list. In September 2003, Vrdolyak called Gross and told him, "Your money matter won't be settled until the Moreno matter is settled. Do you understand me?" Gross was never called as a witness, either in court or in a deposition, in connection with the Moreno case. But Gross claims that he still hasn't received his compensation.

Gross sued the Town of Cicero, along with Loren-Maltese, Vrdolyak, and Gonzalez (collectively the "Individual Defendants") under 42 U.S.C. § 1983 for violations of equal protection and free speech under the First and Fourteenth Amendments. Regarding his First

Amendment claims, Gross contended that the defendants retaliated against him for (1) approaching Loren-Maltese about Rhonda's "situation"; (2) encouraging Rhonda to file an EEOC charge; and (3) talking with the lawyers in the Moreno case. Gross also alleged a civil rights conspiracy under 42 U.S.C. § 1985(3). Cicero countersued, alleging breach of fiduciary duty and unjust enrichment. The district court exercised supplemental jurisdiction over these state-law claims.

The litigation was contentious, to put it mildly. There were hundreds of docket entries, numerous motions to strike, and, as was apparent from the deposition transcripts, some tension between the lawyers.

Eventually, both sides moved for summary judgment and the district court, for the most part, found for the defendants. The court granted summary judgment for the defendants on all of Gross's claims. Gross won on Cicero's unjust enrichment claim. But the court granted summary judgment in favor of Cicero on the issue of liability on the fiduciary duty claim.

So the case proceeded to trial on the issue of damages from the breach of fiduciary duty. Gross demanded a jury trial but the court denied it. After a bench trial, the court awarded Cicero Gross's entire salary for all four-plus years of service in Cicero government, which totaled $302,473.79.

Gross appeals and raises a slew of arguments. He challenges the district court's decision on his equal protection and free speech claims. He also appeals the court's grant of summary judgment on Cicero's fiduciary

duty claim, the denial of his jury demand, and the amount of damages the court awarded, along with half a dozen other quarrels he has with the way the trial on damages was conducted. To decide this case, though, only Gross's First Amendment and fiduciary duty arguments warrant extended discussion.

## II.  Preliminary Matters

At the outset, though, we must address several matters stemming from the parties' sub-par briefing in this case. In appellate litigation, as in most other aspects of life, rules must be followed. Federal Rule of Appellate Procedure 28(a)(7) requires appellants (and in some cases appellees, under Fed. R. App. P. 28(b)) to include in their briefs "a statement of facts relevant to the issues submitted for review with appropriate references to the record." Elaborating on this rule, this circuit requires that "[n]o fact shall be stated in this part of the brief unless it is supported by a reference to the page or pages of the record or the appendix where that fact appears." Cir. R. 28(c); *see also* Fed. R. App. P. 28(e). Gross's statement of facts lacks a single citation to the record. Though the Individual Defendants point this out in their response brief, Gross gives no explanation in his reply brief why he failed to cite the record; instead, Gross just hits back at the Defendants' appellate briefs, claiming they contain factual assertions without citations. This kind of tit-for-tat is no way to justify breaking the briefing rules. Gross leaves us no choice but to strike that section of his brief and any assertion

that relies solely upon it. *See Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009).

The Individual Defendants implore us to go further, though. They contend that Gross's error warrants dismissal of his entire appeal. We think that's a bit draconian for two reasons. First, Gross usually provides some support for his factual assertions in his "argument" section (with one notable exception, which we'll discuss later). He typically cites specific paragraphs in his Local Rule 56.1(b) statement. Those paragraphs, in turn, usually contain appropriate record cites. This method of citation violates our briefing rules, for the rules require litigants to cite directly to the record, as opposed to something like a Rule 56.1 statement. *See id.* (citing Fed. R. App. P. 28(e) and Cir. R. 28(c)). But because Gross's citations to specific paragraphs in the Rule 56.1 statement usually lead to appropriate citations to the record, he has given us enough to work with that we decline to strike his brief entirely. *See id.*

Second, when we look at the Defendants' briefs, the proverbial pot-and-kettle idiom comes quickly to mind. The Defendants, too, prefer citing Rule 56.1 statements or like filings, instead of citing the record itself. And though most of the Defendants' factual assertions in their briefs are followed by citations, that's not always the case.

Perhaps most egregious, though, is the Individual Defendants' failure to cite or even acknowledge that the district court previously ruled against them on an argument they raise on appeal. They contend that we should affirm summary judgment simply because Gross

failed to comply with Local Rule 56.1. They further point out that, in the district court, they filed a motion requesting that their own statement of facts be deemed admitted and that Gross's response to their statement of facts be stricken. (R. 189.) In their view, "each of the facts submitted in Defendants' Statement of Uncontested Facts is deemed admitted. . . . [and] [a]s such, Defendants were entitled to summary judgment." (Individual Def.'s Br. 16.) But the Individual Defendants utterly fail to mention that the district court expressly denied that motion. (R. 209.) In addition to the fact that the Defendants have not cross-appealed this ruling, which dooms their argument right out of the gate, *see Pryzina v. Ley*, 813 F.2d 821, 823 (7th Cir. 1987), failing to cite the decision below denying their precise argument on appeal is beyond a breach of our briefing rules; it's downright disingenuous.

We recognize that litigation is contentious and that lawyers must often fight hard for their clients. But this case has turned into a bare-knuckle brawl and it isn't pretty. One lawyer has already been sanctioned by this court for not following the rules. *See Gross v. Town of Cicero*, 528 F.3d 498 (7th Cir. 2008).

Consequently, in reviewing this appeal, we strictly enforce all procedural rules and requirements. As we have repeated time and again, "Judges are not like pigs, hunting for truffles buried in [the record]." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Beyond striking Gross's statement of facts, we strike any of the parties' factual assertions, in any section of their briefs,

that lack direct citation to easily identifiable support in the record. *See Casna*, 574 F.3d at 424; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 n.1 (7th Cir. 2006); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."); *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 975 n. 1 (7th Cir. 2002) ("We further caution counsel that violations of Fed. R. App. P. 28(a)(7) and Circuit Rule 28(c) in the future very well could lead to the brief being stricken, summary affirmance, together with other sanctions.").

There's one final preliminary matter we must address before turning to the merits of this case. In his opening brief, Gross argues that the district court erred in granting summary judgment for the defendants on his equal protection claim. That claim is based on a "class of one" theory. But in *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that "such a 'class-of-one' theory of equal protection has no place in the public employment context." 553 U.S. 591, 128 S. Ct. 2146, 2148-49 (2008). *Engquist* clearly foreclosed this theory.

Perhaps Gross already knew that, though, because in his reply brief Gross acknowledges the fate of his equal protection claim and withdraws it. So we will not give that claim any further consideration.

But we cannot move on without commenting that the abandonment of this claim came one brief too late. In his reply brief, Gross attempts to explain why he's withdrawing the equal protection argument that he so fully

developed in his opening brief. He asserts that the *Engquist* decision came down in between the time he filed his opening and reply briefs. (Gross's Reply Br. 26 ("Since the filing of Gross's Appeal brief, the Supreme Court decided *Engquist*.").) But that's not true. We received Gross's opening brief on July 28, 2008. *Engquist* was decided almost two months earlier, on June 9, 2008. Failing to cite adverse controlling authority makes an argument frivolous. Not only that, but it is "imprudent and unprofessional." *Thompson v. Duke*, 940 F.2d 192, 198 (7th Cir. 1991). We expect more from attorneys who appear before us. *See* Standards for Professional Conduct Within the Seventh Federal Judicial Circuit, "Lawyer's Duties to the Court," ¶ 5, *available at* http:// www.ca7.uscourts.gov/Rules/rules.htm.

### III.  Gross's First Amendment Retaliation Claims

On to the merits. We'll first address whether summary judgment in favor of the Defendants was appropriate on Gross's First Amendment retaliation claims. We review the grant of summary judgment de novo and view the evidence in the light most favorable to Gross, the non-moving party. *Bodenstab v. County of Cook*, 569 F.3d 651, 656 (7th Cir. 2009). Summary judgment is appropriate where the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A public employee doesn't check his First Amendment rights at the door of the government building. *Valentino*

*v. Vill. of S. Chi. Heights*, 575 F.3d 664, 671 (7th Cir. 2009). A public employee has a right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Accordingly, the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits the government from retaliating against its employees for engaging in protected speech. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). But the public employee's free speech rights are not unfettered. *Valentino*, 575 F.3d at 671. A claim for First Amendment retaliation under § 1983 involves a three-step inquiry: (1) whether the employee's speech was constitutionally protected; (2) whether the protected speech was a but-for cause of the employer's action; and (3) whether the employee suffered a deprivation because of the employer's action. *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010).

This case centers on the first step—whether Gross engaged in constitutionally protected speech. That question, which is one of law for the court, *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983), boils down to whether Gross "spoke in the capacity of a private citizen and spoke on a matter of public concern," *Valentino*, 575 F.3d at 671. Because none of the defendants challenges whether Gross spoke as a private citizen, our inquiry focuses for the most part on whether Gross spoke on a matter of public concern. Purely personal grievances do not qualify as matters of public concern. *Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004). Still, "[t]he fact that an employee has a personal stake in the subject matter of the

speech does not necessarily remove the speech from the scope of public concern." *Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006) (quotation omitted). We must look at the "content, form, and context" of the speech to determine if the employee sought to raise issues of *public* concern or whether the employee sought to further only some *private* interest. *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999); *see also Connick*, 461 U.S. at 147-48. Though no one factor is dispositive, the content of the speech is the most important of the three. *Clarke*, 574 F.3d at 377.

Gross asserts four bases for his First Amendment retaliation claims, but only three require extended discussion. Those three are: (1) Gross complaining to Loren-Maltese about sexual harassment in the Cicero police department; (2) Gross telling his daughter to file an EEOC charge; and (3) Gross talking with the plaintiff's attorneys in the Moreno case. Gross claims that the first two resulted in his discharge from positions in the Town government; he claims the third led to his not receiving back pay allegedly owed to him. We will review each in turn.

Before we do, though, we must comment on Gross's fourth claimed basis for relief—civil rights conspiracy under 42 U.S.C. § 1985(3). Again, Gross's shoddy briefing hurts him. "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (quotation omitted). Gross's only mention

of this issue in his opening brief came in a three-sentence footnote that lacked any citation to legal authority. (Gross's Br. 14-15 n.1.) In that footnote, Gross simply says that if we reverse any of his three substantive First Amendment claims, we must reverse the § 1985(3) claim. That argument fails to address the district court's conclusion that § 1985(3) does not afford relief for First Amendment violations. *Gross v. Town of Cicero*, No. 03 C 9465, 2006 WL 288262, at *10 (N.D. Ill. Feb. 1, 2006). Moreover, Gross's footnote does not mention a shred of evidence of conspiracy. Perhaps recognizing this deficiency, Gross, in his reply brief (which is too late anyway), claims that there is a "wealth of direct and circumstantial evidence of a meeting of the minds." (Gross's Reply Br. 25.) But in support, Gross cites eight docket entries—no paragraph or page numbers, and nothing written to let us know what might be significant in those entries. (*Id.* at 26.) That is not a fully developed argument. If the evidence of conspiracy was so substantial, Gross should have had no trouble pointing it out with some specificity. We will not hunt through the record to find this "wealth" of evidence. *See Dunkel*, 927 F.2d at 956. Accordingly, Gross waived his § 1985(3) argument. *See United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (quotation omitted)).

On to the merits of Gross's three substantive bases for his First Amendment claims.

### A.  Gross's Complaints to Loren-Maltese

First, Gross claims he was fired in part because he approached Town President Loren-Maltese to discuss allegations of sexual harassment by Cicero police officer Jerold Rodish. This violated his First Amendment rights, he argues, because his attempts to talk with Loren-Maltese constituted protected speech. On about six occasions, Gross told Loren-Maltese that he wanted to talk about "a situation still going on with Rhonda" and "a problem that's just escalating . . . regarding Rhonda." Though he never discussed the details of the "situation" or "problem," Gross argues that he engaged in constitutionally protected speech because Loren-Maltese indicated that she understood what he wanted to say (e.g., she said she knew why he was there, "what it's about," that she would talk to him later, and to "just call Eddie [Vrdolyak]").

Like the district court, we're dubious of whether Gross ever articulated a "particular viewpoint, grievance or complaint" that could even be considered speech on a matter of public concern. *Wernsing v. Thompson*, 423 F.3d 732, 752 (7th Cir. 2005). The record indicates that Gross never discussed his daughter's "situation" with Loren-Maltese; he never mentioned the police department, Rodish, or any allegations of sexual harassment. Gross's only "speech" was his request to discuss Rhonda's situation with her. Though one ordinarily need not explicitly utter the words "sexual harassment" to make an employer aware of such a problem, *see Gentry v. Export Packaging Co.*, 238 F.3d 842, 849 (7th Cir. 2001),

we have made clear that the First Amendment does not protect merely expressing a desire to speak, even if the viewpoint one desires to express might itself be protected, *Wernsing*, 423 F.3d at 752. "Speech which has not yet occurred . . . is no speech at all." *Id.*

Gross argues, however, that Loren-Maltese's reactions give some indication that she understood what he wanted to communicate. In Gross's view, her responses transformed Gross's statements from a desire to complain into actual complaints. We're skeptical of whether the record supports this argument. There's little evidence to establish that Loren-Maltese understood Rhonda's "situation" or "problem" to mean sexual harassment in the police department. Gross admitted that he never elaborated on what he wanted to talk about. And Gross does not allege that Loren-Maltese said anything about Rodish, sexual harassment, or the police department. Her responses were largely non-descriptive—she said she knew "what it's about." Still, she did say, "Just call Eddie," which might be some slight indication of understanding, since there is some evidence that Rodish was connected to Vrdolyak. And more generally, it's true that a listener's reactions are part of the calculus in determining whether a statement constitutes speech on a matter of public concern. *See Waters v. Churchill*, 511 U.S. 661, 668 (1994).

But whether Loren-Maltese understood what Gross meant is ultimately irrelevant. Gross's speech wasn't constitutionally protected because he never spoke on

a matter of *public* concern.[1] Of course, sex discrimination in public employment can be a matter of public concern. *Kokkinis*, 185 F.3d at 844. But it is not always so. *Id.*; *see also McKenzie v. Milwaukee County*, 381 F.3d 619, 626 (7th Cir. 2004) ("Sexual harassment is indeed an important matter, but not all speech relating to sexual harassment enjoys constitutional protection."). Purely personal grievances do not garner First Amendment protection, *Clarke*, 574 F.3d at 377-78, including personal grievances about sexual harassment in the workplace, *see Phelan*, 463 F.3d at 791; *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir. 1989).

Examining both the content and context of Gross's speech, we, like the district court, conclude that Gross, to the extent that he engaged in any "speech" at all, spoke only about his daughter, Rhonda, with the intent of obtaining some private redress for her. As we've discussed, Gross never mentioned anything to Loren-Maltese about Rodish or harassment of other officers. Instead, Gross privately approached Loren-Maltese about "a situation . . . with Rhonda" and "a problem . . . regarding Rhonda." These words concern a purely personal matter.

---

[1] We note that Gross does not allege that Loren-Maltese silenced him or threatened some penalty if he continued speaking when he approached her on those six occasions. Accordingly, Gross does not claim that Loren-Maltese effected a "prior restraint" on Gross's speech. *See Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

With the *content* of his speech clearly against him, Gross implores us to focus on *context*. Gross tries to show that Gross had a broader purpose in seeking Loren-Maltese's ear by alleging that he knew about other instances of harassment in the police force, particularly by Rodish. But even if that were true, he never communicated that knowledge to Loren-Maltese—in other words, his *speech* never conveyed more than his personal grievance. Moreover, we find Gross's claim that he intended to sound the alarm about a broader pattern of harassment incredible. Gross took no other corrective measures to address Rodish's allegedly systemic and heinous conduct. Gross claims that he knew that other women had been threatened and even physically abused. But he did nothing about it, despite the fact that he was the Chairman of the BOFPC. Instead, after not getting what he wanted from Loren-Maltese, he claims he instructed his daughter to file an EEOC charge. Gross presents no evidence that he did anything to help the other women in the department. *See Phelan*, 463 F.3d at 791. Moreover, Loren-Maltese's responses give no indication that she understood Gross to be raising broader concerns about sexual harassment in the police department. Accordingly, we see no evidence that Gross's attempt to speak with Loren-Maltese was motivated by anything but a private concern for his daughter.

We cannot fault a father for seeking to protect his daughter, especially when she claims to have been sexually harassed. But the law is clear that the First Amendment cannot shield the father's speech when his motive in speaking is a purely personal one, as

Gross's was here. So we affirm summary judgment in favor of the defendants on this issue.

## B. Telling Rhonda to File an EEOC Charge

Gross next argues that he also engaged in constitutionally protected speech when he "encouraged" his daughter to file an EEOC charge in response to Rodish's conduct. This argument is a non-starter for two reasons. First, like the previous issue, we see no evidence that Gross spoke on a matter of public concern. The record gives hardly any indication of what Gross's "encouragement" actually entailed—Gross merely points us to his deposition, where he said, "I told her to go to the EEOC." Nothing in the record suggests that Gross had any motive other than to help his daughter seek redress. *See id.*

Again, Gross contends that his knowledge of other incidents of harassment involving other officers is sufficient to infer Gross's intent to raise a matter of public concern. As we discussed above, we disagree. The record fails to show that Gross encouraged other officers to file EEOC charges, nor does it show that Gross encouraged his daughter to file the charge to vindicate the interests of other female officers or to expose a pattern of harassment in the police department. Thus, neither the content (which is almost entirely unknown) nor the context of Gross's statements to his daughter indicates that he spoke on a matter of public concern.

Alternatively, Gross fails to show that any defendant knew that he told his daughter to file an EEOC charge.

This bears on the second step of the ordinary First Amendment retaliation analysis—causation. Gross identifies several statements in the record in which witnesses heard Loren-Maltese say that she did not trust Gross or his daughter because of "this EEOC thing" and that "you're lucky your daughter has a job."[2] But those statements indicate Loren-Maltese's displeasure with Rhonda filing the EEOC charge, not with Gross's telling her to file. Gross fails to cite any evidence that Loren-Maltese or any other defendant knew what Gross told his daughter—or even whether he told his daughter anything at all. But what Gross told his daughter is the speech we're concerned with here. To the extent filing an EEOC charge constitutes "speech," it was Rhonda's

---

[2] Gross also alleges that Loren-Maltese stated in her deposition that she fired Gross "because of 'his daughter,'" (Gross's Br. 19 (quoting R.171 ¶ 37)), which Gross claims is evidence that Loren-Maltese retaliated against Gross for approaching her about Rhonda's situation and his encouraging Rhonda to file an EEOC charge. This argument mischaracterizes the evidence. Loren-Maltese said that she did not reappoint Gross to the BOFPC in part because she believed Rhonda received favorable treatment from the police commission. For example, she testified that she was aware of complaints about Rhonda for which other officers would have been brought up on charges before the commission. (Loren-Maltese Dep. 85, Apr. 13, 2005.) Loren-Maltese's references to "his daughter" did not pertain to Rhonda's EEOC charges or any allegations of sexual harassment in the police department. Accordingly, these statements are irrelevant to Gross's First Amendment retaliation claims.

speech, not Gross's. The record contains no evidence that Gross participated in the filing of the charge or as a witness in the EEOC proceedings. *Cf. Salas v. Wis. Dep't of Corrs.*, 493 F.3d 913, 925 & n.8 (7th Cir. 2007) (finding that participation as witness on EEOC charge constituted protected speech, but noting that parties did not address fact that plaintiff-witness had not yet testified). And Gross cites no authority that shows how he can recover under the First Amendment for retaliation based on what his daughter said or did. Because Gross failed to produce any evidence that the defendants were aware of *his* speech, Gross cannot demonstrate a triable issue of fact that his discharge was at all motivated by his encouraging his daughter to go to the EEOC. Accordingly, we affirm the district court's decision on this issue as well.

## C. Gross's Participation in the Moreno Case

Gross's final basis for his First Amendment retaliation claim stems from his alleged involvement in separate, unrelated litigation against Cicero. For a variety of reasons, we are compelled to strike this portion of Gross's brief and will dismiss this argument as undeveloped. As we explained earlier in this opinion, the parties' briefing, particularly Gross's, was often woefully inadequate and violated multiple procedural rules. We said we will strictly enforce those rules when we see violations. And that is what we have here.

First, Gross failed to support his factual assertions with appropriate citations to the record, in violation of

Fed. R. App. P. 28(a)(9)(A) & (e). Gross's argument on this issue is a factual one. He claims that he received a call from Vrdolyak who told him that he wouldn't receive certain compensation he was owed until the Moreno litigation was resolved, which Gross argues was retaliation for his talking with the plaintiff's lawyers. The district court rejected this argument because it concluded that Gross never talked with Moreno's lawyers until after Vrdolyak called Gross. On appeal, Gross disputes that view of the timing and argues that Vrdloyak's failure to address his complaint on back pay was ongoing retaliation for his involvement in the Moreno lawsuit.

To evaluate Gross's argument, we must know how the record supports Gross's view of the facts. In his brief, Gross provides what appears to be his version of events in bullet-point form. (Gross's Br. 23-25.) However, only one of the bulleted paragraphs contains any citation to the record. At the end of the bulleted list, Gross provides a general citation to 22 paragraphs in his Local Rule 56.1(b) statement. (*Id.* at 25.) We have already explained that citing to litigation documents like Rule 56.1 statements, in lieu of citing directly to the record, violates our briefing rules. *See Casna*, 574 F.3d at 424. Still, we let this slide and didn't strike Gross's entire appellate brief because, in most instances, he supports each factual assertion with a citation to a specific paragraph in his Rule 56.1(b) statement, which then usually corresponds to a specific record citation. But here, Gross leaves it to us to match the paragraphs from his Rule 56.1 statement to his bullet points and decipher how the record supports each of his factual claims (which is made even

more difficult by the fact that some paragraphs in the Rule 56.1 statement lack any citation to the record). And as we discussed, Gross's statement of facts provides us no help. This is a truffle-hunting expedition that we will not engage in. *See Dunkel*, 927 F.2d at 956.

Beyond failing to appropriately cite the record, Gross fails to cite any legal authority that would allow us to rule in his favor on this issue. But citations to authorities are required. *See* Fed. R. App. P. 28(a)(9)(A). For example, Gross does not claim to have testified in the Moreno matter, in court or in a deposition. So even if we assume his timeline of events is accurate, Gross fails to cite any authority supporting his claim that talking with a plaintiff's lawyer or being on a witness list constitutes speech on a matter of public concern, an issue we've expressed our curiosity about in a prior opinion, *see Salas*, 493 F.3d at 925 n.8 ("Interestingly, the parties do not address the fact that Salas had not yet testified in the EEOC investigation when he was terminated, nor do they delineate what communications, if any, Salas had with Rogers or the EEOC investigator before he was fired.").

Additionally, Gross fails to respond to the Individual Defendants' argument that Vrdolyak is not a state actor. The First Amendment only protects a person from the government, or a particular state actor, not from private citizens. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). The Individual Defendants contend that Vrdolyak is merely a private lawyer without authority to speak for the

Town. Gross fails to counter this claim on appeal. Instead, in his reply brief, Gross merely tries to link Vrdolyak to Cicero by alleging that "Cicero and [then-Town President] Gonzalez would have to authorize Gross's back pay payment." (Gross's Reply Br. 16.) But Gross fails to provide a citation to any authority, legal or factual, supporting that assertion. We are left without any developed argument as to why Vrdolyak's alleged statement regarding Gross's back pay should be considered state action.

Accordingly, in light of Gross's rule violations as well as his failure to develop a viable argument, Gross leaves us no choice but to affirm the district court's decision on this issue.

### IV.  Cicero's Fiduciary Duty Claim

Gross challenges Cicero's summary judgment victory on liability on the fiduciary duty theory. Though Gross presents several arguments, we need only address one. For we are convinced that the district court improperly concluded as a matter of law that Gross breached a fiduciary duty.

Under Illinois law, upon which this theory is based, recovery for a breach of fiduciary duty requires proof of three elements: "[1] a fiduciary duty exists, [2] that the fiduciary duty was breached, and [3] that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). Our trouble with the district court's ruling lies at the

intersection of the first two elements—just what duty Gross owed the Town of Cicero and how he might have breached it.

It has long been established in Illinois that "a public officer occupies a fiduciary relationship to the political entity on whose behalf he serves." *Chi. Park Dist. v. Kenroy, Inc.*, 402 N.E.2d 181, 186 (Ill. 1980) (citing cases). The most well-known of a public official's fiduciary duties is that of undivided loyalty to the office and the people whom he serves. *See Madlener v. Finley*, 538 N.E.2d 520, 522 (Ill. 1989) (citing *People v. Savaiano*, 359 N.E.2d 475, 480 (Ill. 1976), and *City of Chicago ex rel. Cohen v. Keane*, 357 N.E.2d 452, 455 (Ill. 1976)); *see also Brown v. Kirk*, 355 N.E.2d 12, 15 (Ill. 1976). Emanating in part from section 3 of the Illinois Corrupt Practices Act, 50 ILCS 105/3, *see Keane*, 357 N.E.2d at 455, this duty is "sweeping," *see People v. Scharlau*, 565 N.E.2d 1319, 1325 (Ill. 1990), and commands a public official to refrain from self-dealing and conflicts of interest, *see Madlener*, 538 N.E.2d at 522.

The duty of loyalty is not the only fiduciary duty Illinois recognizes for its public officials. Other duties may be prescribed by statute or found in common law. *Id.*; *see also People v. Grever*, 856 N.E.2d 378, 387 (Ill. 2006) ("The right to a civil remedy for breach of a statutorily created fiduciary duty is clear."). For example, the Illinois Supreme Court has held that the Pension Code, 40 ILCS 5/1-109, establishes that a public pension board owes a fiduciary duty to its participants and beneficiaries. *Marconi v. Chi. Heights Police Pension Bd.*, 870 N.E.2d 273, 299 (Ill. 2006).

In this case, the district court looked to yet another statute to define the scope of Gross's fiduciary duty. And it is the court's reliance on that statute and its characterization of Gross's duty with which we disagree. Cicero's claim was based on Gross's own admissions in his depositions that he sought to preserve his employment and that of his daughter by knowingly appointing police officers whom he knew the Town President desired but whom he also personally believed were unqualified for the job. Instead of framing that argument in a duty-of-loyalty context, though, the district court drew on the Illinois statutes that grant a municipal BOFPC the authority to appoint police officers and set forth the standards by which such officers must be evaluated and appointed. *See Gross*, 2006 WL 288262, at *7 (citing 65 ILCS 5/10-2.1-4 & 5/10-2.1-6). From these statutes, the court gleaned a fiduciary duty owed by BOFPC commissioners to exercise independent judgment in appointing officers. The court concluded that Gross breached that duty by appointing certain officers only upon the orders of Town President Loren-Maltese and not upon his own assessment and approval of those officers' qualifications.

But the BOFPC statutes do not speak in terms of fiduciary duties nor do they state that BOFPC commissioners must ignore the wishes of other public officials, particularly the official who appoints them. Requiring the exercise of good and independent judgment in appointing police officers sounds more akin to imposing a fiduciary duty of care on a public official. But Illinois law provides that public officials are "immune from individual

liability for the performance of discretionary duties in good faith*." Kinzer ex rel. City of Chicago v. City of Chicago*, 539 N.E.2d 1216, 1220 (Ill. 1989) (quotation omitted); *see also* 745 ILCS 10/2-201 ("Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."). Illinois law seems to require more than just a breach of the duty of care to hold a public official liable on a fiduciary duty theory.

As a federal court, we are wary of expanding the liability of certain public officials under state law without a firm basis upon which to do so. Neither the parties nor the district court cites any Illinois case establishing a fiduciary duty under the BOFPC statutes, and our research has not uncovered one either. Moreover, the BOFPC statutes do not provide for the liability of BOFPC commissioners; liability must be inferred from the statute, as it has from other Illinois statutes like the Corrupt Practices Act and the Pension Code. But we see little similarity between the BOFPC statutes and those laws under which Illinois courts have found fiduciary duties. The Corrupt Practices Act specifically proscribes self-dealing and conflicts of interest in matters upon which an official exercises his discretion. 50 ILCS 105/3(a). This is the essence of the fiduciary duty of loyalty—"these and kindred statutes reflect the common law doctrine that 'the faithful performance of official duties is best secured if a governmental officer, like any other person

holding fiduciary position, is not called upon to make decisions that may advance or injure his individual interest.'" *Keane*, 357 N.E.2d at 455 (quoting *Brown*, 355 N.E.2d at 15). Furthermore, in other statutes that form the basis for a recognized fiduciary duty, the text itself explicitly creates such a duty. The Pension Code is an example. 40 ILCS 5/1-109 ("A fiduciary with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries . . . .").

The BOFPC statutes lack any analog to common law doctrine and do not spell out a fiduciary duty for BOFPC commissioners. Rather, the BOFPC statutes merely grant appointment authority and explain how it should be exercised. They do not require the commissioners to exercise completely in dependent judgment (though one would hope they would do so) and ignore the desires of those who appoint them. Accordingly, without some Illinois authority or any indication in the text, we cannot conclude that the BOFPC statutes imposed a fiduciary duty on Gross.

But that does not end our inquiry of this issue. Gross as BOFPC Chairman is of course still subject to the duty of loyalty that covers all public officials. Cicero has produced evidence, mostly in the form of Gross's own depositions, that Gross appointed police officers he believed were unqualified because he was worried about his and his daughter's employment. But whether this conduct could constitute a conflict of interest is unclear

under Illinois law. In *People v. Scharlau*, the Illinois Supreme Court upheld the convictions of several public officials who negotiated on behalf of a municipality for a consent decree in a Voting Rights Act case, through which the officials sought a provision that would protect their employment with the municipality for several years. The court, examining several good-government statutes, including the Corrupt Practices Act, observed that such "sweeping" statutes reach action taken in exchange for "a promise of employment." 565 N.E.2d at 1326.

Though not a civil case, we find *Scharlau* instructive on how the Illinois courts view the statutes upon which Gross's fiduciary duty of loyalty is based. If the evidence shows that Gross and Loren-Maltese agreed upon some *quid pro quo* arrangement by which Loren-Maltese would continue Gross's and his daughter's employ if Gross continued to skirt the BOFPC evaluation process and appoint her hand-picked officers, even though he believed they were unqualified, such action would constitute an exchange for a promise of employment. We think the evidence Cicero produced is sufficient, at least barely, to reach a trier of fact on the question whether such an arrangement actually existed.

But Cicero's evidence is not sufficient to award it an outright victory on liability at the summary judgment stage. There is no direct evidence of a *quid pro quo* arrangement between Gross and Loren-Maltese, and there is some question as to whether the disputed hires were truly unqualified, because each was ultimately certified as

a Law Enforcement Officer under Illinois law. Moreover, Gross points out that he believed he was merely being a good employee and following orders. Gross cites to passages in his deposition where he stated that he viewed Loren-Maltese as his "superior" and that he believed she had the legal authority to override his decisions as BOFPC Chairman.

Should a trier of fact credit Gross's view of the evidence, then we would be hard-pressed to conclude that Gross engaged in self-dealing as proscribed by the duty of loyalty, the Corrupt Practices Act, and the court's interpretation in *Scharlau*. We refuse to hold that a mere concern for one's continued employment as a public official constitutes a conflict of interest. If that were the case, we are confident that most politicians and public servants would be found liable at some point in their careers. Acting in a way that might be contrary to one's own beliefs, but doing so on the orders of those who control one's employment, is commonplace and surely does not in itself violate any fiduciary duty. A contrary view would wreak havoc on Illinois's system of public employment—subordinates would have to refuse to act when they subjectively disagreed with the orders of their employers. So, without a more exacting command from the Illinois courts, we decline to interpret Illinois's fiduciary duty of loyalty to impose liability on those who desire to continue their employment by acting on the commands of their superiors. We will accordingly reverse the grant of summary judgment for Cicero on its fiduciary duty claim and remand to allow the trier of fact to determine whether Gross breached his

fiduciary duty of loyalty to Cicero by engaging in self-dealing, that is, if Cicero continues to pursue this claim on remand.

Reversal of Cicero's judgment on liability also means that the $302,473.79 damages awarded to Cicero cannot stand, so we are not required to address Gross's argument challenging that award. But since we find some merit to Gross's argument, and since this damages issue will reappear if, on remand, Cicero wins again on the liability issue, we offer these additional comments.

The $302,473.79 awarded by the district court was the entire salary that Gross received during his four-plus years of service in Cicero government. Although this total-salary forfeiture is possible for breach of fiduciary duty under Illinois law, we think in this case it can be sustained only with more specific findings on the scope and timing of Gross's alleged *quid pro quo* arrangement with Loren-Maltese.

Illinois law permits a complete forfeiture of any salary paid to a fiduciary during the time when he was breaching his duty to the employer. *Levy v. Markal Sales Corp.*, 643 N.E.2d 1206, 1219 (Ill. App. Ct. 1994). The salary subject to forfeiture is not limited based on the ratio of injurious to legitimate work performed, since an agent who breaches his fiduciary duty has no right to any compensation while acting adverse to the principal's interests. *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1314-15 (Ill. App. Ct. 1980). Forfeiture is limited, however, to the "time when the fiduciary was breaching his duty." *Levy*,

643 N.E.2d at 1219; *see also ABC Trans Nat'l*, 413 N.E.2d at 1315 ("The agent retains compensation rightfully earned before the breach, for specific periods.").

The district court's total-salary measure of damages assumes that Gross was breaching his duty during his entire time as BOFPC Chairman, but at this stage, the evidence does not support that assumption. It is unknown whether Gross's alleged *quid pro quo* arrangement with Loren-Maltese was in place at the outset of Gross's appointment to the BOFPC, or developed some time into that appointment, perhaps only when the first of Loren-Maltese's preferred police officer candidates came up for consideration.

These details on the timing of Gross's unlawful agreement with Loren-Maltese should be developed in the record as an adjunct to the question of whether such an agreement even existed. If Cicero's evidence is sufficient to show that Gross actually agreed to abandon his BOFPC duties by appointing Loren-Maltese's hand-picked officers in exchange for a promise of continued employment, the evidence should also allow for a reasonable determination of when during Gross's tenure this agreement was in place. From there, the proportion of Gross's total $302,473.79 earnings subject to forfeiture for breach of fiduciary duty may be assessed. *See Vendo Co. v. Stoner*, 321 N.E.2d 1, 14 (Ill. 1974) (considering three-year, five-month period when fiduciary breached duty by financing competitor's operations); *Levy*, 643 N.E.2d at 1219 (upholding forfeiture of corporate directors' salary received while they were running a com-

petitor corporation "and thus breaching their fiduciary duty"); *ABC Trans Nat'l*, 413 N.E.2d at 1315 (limiting salary forfeiture to four-month period when corporate officers breached their duty by conspiring with employees to move to a competitor).

## V. Conclusion

We AFFIRM the district court's grant of summary judgment on Gross's equal protection, First Amendment, and civil rights conspiracy claims. We REVERSE the court's grant of summary judgment for Cicero on its fiduciary duty claim and REMAND for further proceedings. Each side will bear its own costs on appeal.